**W.C.M. WINDOW CO., INC., et al., Plaintiffs-Appellees,**

v.

**E. Allen BERNARDI, Director of the Department of Labor, State of Illinois, Defendant-Appellant.**

**No. 83–1984.**

United States Court of Appeals, Seventh Circuit.

Argued Jan. 10, 1984.

Decided March 16, 1984.

As Amended on Denial of Rehearing and Rehearing En Banc May 11, 1984.

---

Patricia Rosen, Asst. Atty. Gen., Chicago, Ill., for defendant-appellant.

M. Barry Forman, St. Louis, Mo., for plaintiffs-appellees.

Before PELL, CUDAHY and POSNER, Circuit Judges.

POSNER, Circuit Judge.

E. Allen Bernardi, the director of the Illinois Department of Labor, appeals from a decision enjoining him from enforcing Illinois' Preference to Citizens on Public Works Projects Act, Ill.Rev.Stat.1981, ch. 48, ¶¶ 269–274. The Act (in paragraph 271) provides that the contractor on "any public works project or improvement for the State of Illinois or any political subdivision, municipal corporation or other governmental unit thereof shall employ only Illinois laborers on such project or improvement," unless the contractor certifies, and the contracting officer finds, that Illinois laborers either "are not available, or are incapable of performing the particular type of work involved ...." Violation of the preference law (as it is called) is a misdemeanor punishable by a maximum jail sentence of 30 days and a maximum fine of $500. See Ill.Rev.Stat.1981, ch. 48, ¶ 274; ch. 38, ¶¶ 1005-8-3(a)(3), 1005-9-1(a)(3). The district court held that the law violates both the privileges and immunities clause of Article IV, section 2 of the Constitution ("The Citizens of each State shall be entitled to all Privileges and Immunities of Citizens in the several States"), and the commerce clause of Article I, section 8 ("The Congress shall have Power ... To regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes").

The public school board of Decatur, Illinois hired the W.C.M. Window Company, an Illinois corporation, to replace some windows. W.C.M. subcontracted the work to Custom Contracting Company, an unincorporated association of Missouri residents.

On April 12, 1983, Bernardi brought suit in state court against W.C.M. and Custom, asking that they be enjoined from violating the preference law. On the same day, W.C.M., its president, and three individuals who are members of Custom Contracting brought this suit (under 42 U.S.C. § 1983) against Bernardi, and asked the district court to issue a temporary restraining order to prevent Bernardi from proceeding with his state court action. The district court issued the order and later converted it into a permanent injunction.

■ The first question we consider is whether the district court should have abstained, under the doctrine of *Younger v. Harris*, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971), in favor of the state court in which Bernardi had filed his action. (The other grounds for abstention urged by the state clearly have no merit.) *Younger* held that a federal district court may not enjoin a state criminal prosecution in a civil rights suit, provided that the plaintiff in that suit can raise his federal claims in state court by way of defense to the prosecution. Its doctrine has since been expanded to cases where a state civil proceeding sought to be enjoined involved "important state interests." See, e.g., *Middlesex County Ethics Comm. v. Garden State Bar Ass'n*, 457 U.S. 423, 432, 102 S.Ct. 2515, 2521–22, 73 L.Ed.2d 116 (1982) (state proceeding to discipline a lawyer for unethical conduct); see also *Ciotti v. County of Cook*, 712 F.2d 312, 313 (7th Cir.1983); *Cate v. Oldham*, 707 F.2d 1176, 1183 (11th Cir.1983); *Coruzzi v. State of New Jersey*, 705 F.2d 688, 690–91 (3d Cir.1983). We must consider whether "important state interests" are involved here, and also the significance of the facts that (1) the plaintiffs in the federal court action and the defendants in the state court action are not identical and (2) the Illinois Supreme Court in *People ex rel. Holland v. Bleigh Construction Co.*, 61 Ill.2d 258, 335 N.E.2d 469 (1975), upheld the preference law against a challenge based on the same grounds urged by these plaintiffs.

■ The *Younger* doctrine is based on, and its contours established by, two principles of equity jurisprudence. The first is that an injunction is an extraordinary remedy, rarely available as a matter of right and never more extraordinary than when, if granted, it would prevent government officials from proceeding under a statute founded on important state interests against a violator of the statute; such an injunction would offend comity and federalism. The second principle is that an injunction will not be issued when the plaintiff has an adequate remedy at law, which he does if he can assert the ground on which he seeks an injunction as a defense to the very proceeding that the injunction would put a stop to.

Although the plaintiffs apparently did violate the Illinois preference law, the state was not sufficiently exercised about the violation to bring a criminal proceeding, or even a quasi-criminal proceeding as in *Middlesex*. It was content to seek an injunction against continuing the violation. This is some evidence that an injunction against Bernardi's state court action would not impair "important state interests," though not much evidence; the state may simply have believed that, in the circumstances, an injunctive remedy would be cheaper, swifter, and more efficacious. An additional point, however, is that the policy underlying the preference law is less central to the goals of state government than protecting the health, safety, and morals of its population—the types of interest involved in cases where abstention under the *Younger* doctrine has been ordered. Thus, both the nature of the remedy sought by, and more important the underlying right asserted by, the state in its suit make the remedy that these plaintiffs are seeking less invasive of state sovereignty than in the usual *Younger* case.

■ Moreover, the plaintiffs may not have "an adequate opportunity in the state proceedings to raise [their] constitutional challenges." *Middlesex County Ethics Comm. v. Garden State Bar Ass'n, supra,* 457 U.S. at 432, 102 S.Ct. at 2521–22. Al-

though this quotation could be taken to refer just to procedural obstacles to raising a federal claim in state court, rather than also to any substantive obstacle created by adverse precedent, we know from *Gibson v. Berryhill*, 411 U.S. 564, 577–79, 93 S.Ct. 1689, 1697–98, 36 L.Ed.2d 488 (1973) (cited approvingly in *Middlesex*), that the *Younger* doctrine is inapplicable when the state tribunal is deemed to have prejudged the federal claim because the tribunal has a pecuniary interest in the outcome (see also *United Church of the Medical Center v. Medical Center Comm'n*, 689 F.2d 693, 699–700 (7th Cir.1982)); and maybe other types of prejudgment also make the doctrine inapplicable. The analogous requirements of exhaustion of remedies in administrative and in habeas corpus cases are satisfied when adverse precedent makes the remedies futile as a practical matter to pursue. See *Layton v. Carson*, 479 F.2d 1275, 1276–77 (5th Cir.1973) (per curiam); see also *Carter v. Estelle*, 677 F.2d 427, 446 (5th Cir.1982); *West v. Bergland*, 611 F.2d 710, 717 (8th Cir.1979).

If the Illinois courts were certain to adhere to *Bleigh* in Bernardi's suit against the contractors, the contractors would have no practical remedy in the state courts, so that their only federal remedy (if we abstained) would be to ask the United States Supreme Court to review the inevitable judgment against them in the state courts. The Supreme Court's heavy workload, which prevents it from accepting more than a tiny fraction of the requests for review that it gets, would make this route a chancy one. And we doubt that the Court would want us to add to its workload by expanding the *Younger* doctrine. But the Illinois Supreme Court might be willing to reexamine *Bleigh* in light of the U.S. Supreme Court's subsequent decisions in *Hicklin v. Orbeck*, 437 U.S. 518, 98 S.Ct. 2482, 57 L.Ed.2d 397 (1978), and *United Bldg. & Construction Trades Council v. Mayor & Council of Camden*, —— U.S. ——, 104 S.Ct. 1020, 79 L.Ed.2d 249 (1984) the latter decided after argument in this case. The discussion of the privileges and immunities issue in *Bleigh* has been termed "cursory" in a decision which states that *Hicklin* "presumptively overruled" *Bleigh. Neshaminy Constructors, Inc. v. Krause*, 181 N.J.Super. 376, 384 n. 6, 437 A.2d 733, 737 n. 6 (Ch.1981), modified (on unrelated grounds) and affirmed, 187 N.J.Super. 174, 453 A.2d 1359 (App.Div.1982) (per curiam). And we are told that the Illinois Supreme Court has recently heard argument in a case in which it is being asked to overrule *Bleigh.*

*Hicklin* invalidated under the privileges and immunities clause an Alaska statute that required all employment, whether public or private, that was connected with oil and gas leases to which the state was a party to be offered first to Alaska residents. The Supreme Court's opinion is narrowly written, however, and emphasizes facts that have no exact counterparts in the present case. One such fact is that "the major cause of Alaska's high unemployment was not the influx of nonresidents seeking employment, but rather the fact that a substantial number of Alaska's jobless residents—especially the unemployed Eskimo and Indian residents—were unable to secure employment either because of their lack of education and job training or because of their geographical remoteness from job opportunities." 437 U.S. at 526–27, 98 S.Ct. at 2487–88. Another is that "a highly skilled and educated resident who has never been unemployed is entitled to precisely the same preferential treatment as the unskilled, habitually unemployed Arctic Eskimo enrolled in a job-training program." *Id.* at 527, 98 S.Ct. at 2488. And another is that "Alaska has little or no proprietary interest in much of the activity swept within the ambit of Alaska Hire [the name of the statute]." *Id.* at 529, 98 S.Ct. at 2489. See also *United Bldg. & Construction Trades Council v. Mayor & Council of Camden, supra*, —— U.S. at ——, 104 S.Ct. at 1028–29. As an original matter, the absence of these particular facts from the record of the present case may not save Illinois' preference law, as we shall see. But we doubt that a court committed, as all courts are, to *stare decisis*,

albeit in its flexible American form, would think that the *Hicklin* decision *required* the overruling of *Bleigh* —especially when, in a case decided after *Hicklin,* the Supreme Court cited *Bleigh* with approval, though apparently with reference only to its commerce clause holding. See *Reeves, Inc. v. Stake,* 447 U.S. 429, 437 n. 9, 100 S.Ct. 2271, 2277 n. 9, 65 L.Ed.2d 244 (1980).

*United Bldg. & Construction Trades Council v. Mayor & Council of Camden* involved a challenge under the privileges and immunities clause to an ordinance of the city of Camden, New Jersey that required that at least 40 percent of the employees of contractors and subcontractors working on city construction projects be Camden residents. Although the Supreme Court did not invalidate the ordinance, it did hold that it "discriminates against a protected privilege," —— U.S. at ——, 104 S.Ct. at 1029, and could be upheld only if the city justified the discrimination by showing (in the language of an earlier case) that nonresidents "constitute a peculiar source of the evil at which the statute is aimed." *Toomer v. Witsell,* 334 U.S. 385, 398, 68 S.Ct. 1156, 1163, 92 L.Ed. 1460 (1948), quoted at —— U.S. ——, 104 S.Ct. 1029–30. Since there had been no trial in *United,* the Court remanded the case to the trial court to give the city a chance to try to justify the ordinance.

It is quite possible that *United Bldg. & Construction* would induce the Supreme Court of Illinois to reexamine *Bleigh* at least to the extent of insisting that the state produce some concrete justification for the preference law. But it is not certain; the court might be willing to take judicial notice of conditions in Illinois justifying the law. Even if we could state with confidence that *United Bldg. & Construction* would induce the Illinois court to overrule *Bleigh* to the extent of requiring the state to make a greater effort at justification than was attempted in that case (or for that matter in this one), there would still be a serious question whether we should order abstention on the basis of a decision that was handed down after the proceedings in the district court were completed. One of the standard criticisms of abstention—that it delays litigation, sometimes inordinately—would gain additional force if abstention were ordered on the basis of events that first came into existence while the case was on appeal.

In any event, the three individual plaintiffs who are members of Custom Contracting Company may have no state court remedy at all for a violation of the privileges and immunities clause, because they were not named as defendants in that action. The omission would not be important if Custom Contracting or W.C.M., which were named, could represent those individuals' interests in that action. *Hicks v. Miranda,* 422 U.S. 332, 348–49, 95 S.Ct. 2281, 2291, 45 L.Ed.2d 223 (1975); *Women's Community Health Center v. Texas Health Facilities Comm'n,* 685 F.2d 974, 981–82 (5th Cir.1982). But neither may have standing to challenge the preference law on privileges and immunities grounds. (Although Bernardi has not raised this point in the present action, his silence is not a commitment not to raise it in the state court action if we order abstention and that action is therefore allowed to proceed to judgment.)

■■■ The Supreme Court held long ago that the privileges and immunities clause of Article IV does not protect corporations, *Paul v. Virginia,* 75 U.S. (8 Wall.) 168, 177, 181, 19 L.Ed. 357 (1869); and this holding, though criticized, see Eule, *Laying the Dormant Commerce Clause to Rest,* 91 Yale L.J. 425, 450–54 (1982), is too firmly established to be reexamined by a lower court, especially after its recent (if laconic) reaffirmance by the Supreme Court in *Western & Southern Life Ins. Co. v. State Bd. of Equalization,* 451 U.S. 648, 665, 101 S.Ct. 2070, 2081, 68 L.Ed.2d 514 (1981). On the basis of a dictum in *Paul* that confines "citizens" in the privileges and immunities clause to "natural persons," 75 U.S. at 177, 19 L.Ed. 357 the only court to consider whether an unincorporated association is a citizen within the meaning of the clause has held that it is not. *American Trucking Ass'ns, Inc. v. Larson,* 683 F.2d 787,

790 (3d Cir.1982). Given *Paul*—even without the dictum—this conclusion seems inescapable. An unincorporated association is not a natural person, and for most purposes not a citizen. Any legal protection it enjoys is, as with corporations, a matter of the state's grace. And in Illinois at least, that protection is much less extensive than what corporations enjoy. See Ill.Rev.Stat. 1981, ch. 30, ¶ 185; ch. 38, ¶ 2–15; ch. 120, ¶ 15–1501(a)(4).

If Custom Contracting is not a citizen under the privileges and immunities clause, it might seem to follow ineluctably that its individual members who are plaintiffs in this suit could not hope for a favorable interpretation of that clause in the state court action, because any attempt by Custom Contracting to challenge the Illinois preference law on privileges and immunities grounds would be summarily rejected on the authority of *Paul* and *Larson*. This may well be the correct conclusion, but against it can be set the modern view that an association has standing to complain of injuries to its members. See, e.g., *NAACP v. Alabama*, 357 U.S. 449, 459, 78 S.Ct. 1163, 1170, 2 L.Ed.2d 1488 (1958); *South East Lake View Neighbors v. HUD*, 685 F.2d 1027, 1032 (7th Cir.1982); 6 Wright & Miller, Federal Practice and Procedure § 1552, at pp. 693–94 (1971). This view fuses the legal identity of an association with that of its members, and if applicable here would allow Custom Contracting to complain in Bernardi's state court action that the preference law violates its members' rights under the privileges and immunities clause, even though the law could not violate the association's own rights under the clause, because it has none. There is Illinois authority for allowing an association to bring an equity suit on this basis, see *DeWitt Cty. Taxpayers' Ass'n v. County Bd.*, 112 Ill.App.3d 332, 334–35, 68 Ill.Dec. 61, 63, 445 N.E.2d 509, 511 (1983); equally should an association be able to defend itself against a suit on this basis.

Although this is a powerful argument, it cannot, after *Larson*, completely still our doubts that the state court action provides an adequate remedy for all of the plaintiffs in the present action. Another point is that Custom Contracting might not assert all the rights of its members in that action. All of these doubts are augmented by the vagueness of the state's references in this suit to the state court action. (At oral argument, for example, counsel for the state was unable to tell us what relief Bernardi had requested in that action.) While asking us to abstain, the state has given us no information on whether the state court action provides these plaintiffs with a usable vehicle for asserting their federal constitutional claims. As a further example, we are not told why Bernardi asked only for an injunction.

For all of these reasons, we conclude that the equities did not require the district judge to abstain; we need not decide whether they would have permitted him to do so. So we come to the merits, and begin with the commerce clause. Although in words simply an authorization to Congress to regulate commerce among the states or with foreign nations, the commerce clause has long been interpreted to contain an implicit prohibition (the "negative" or "dormant" commerce clause), enforceable by the courts without congressional action, against a state's discriminating against or unduly burdening interstate commerce. See, e.g., *Cooley v. Board of Wardens*, 53 U.S. (12 How.) 299, 13 L.Ed. 996 (1851); *Southern Pac. Co. v. Arizona*, 325 U.S. 761, 769, 65 S.Ct. 1515, 1520, 89 L.Ed. 1915 (1945). In an age when all parts of the nation's economy are interconnected, so that a state can do hardly anything in the way of regulation or taxation without in a sense burdening interstate commerce, the application of this standard to particular cases is often problematic. But one thing is clear: a state may not erect a tariff wall protecting its industries from the competition of industries in other states and in foreign countries merely to promote the economic welfare of its own citizens. *Baldwin v. G.A.F. Seelig, Inc.*, 294 U.S. 511, 522, 55 S.Ct. 497, 500, 79

L.Ed. 1032 (1935); see *Boston Stock Exchange v. State Tax Comm'n*, 429 U.S. 318, 335–37, 97 S.Ct. 599, 609–10, 50 L.Ed.2d 514 (1977).

■ The Illinois preference law erects a nearly prohibitive tariff—saved from being completely prohibitive only by the exception for cases where the requisite labor is not obtainable from Illinoians—against the use on any public project in Illinois of labor imported from another state or from a foreign country. The law has the same general effect on the flow into Illinois of labor services supplied by individuals unwilling to change their residence to Illinois as an Illinois tariff on imports of coal would have on the flow of coal into the state. The preference law may confer benefits on the state in reduced unemployment among Illinois residents and hence reduced employment insurance costs to employers in the state, though we shall see later that this is far from certain, and maybe not even likely. But a tariff on imported coal would confer the same benefit, since it would tend to increase the demand for coal mined in Illinois and thus increase employment in the coal mines in the state. True, if Illinois were an exporter as well as importer of coal, the tariff's only effects might be to cause Illinois mines to divert output from their export markets to the Illinois market and to cause out-of-state mines that formerly sold coal in Illinois to replace the Illinois mines in serving those out-of-state markets. But of course the same thing might happen as a result of the preference law (the record contains nothing about the law's effects): Illinois residents who now work either on private construction projects in the state or on public construction projects across the state line might replace, on Illinois public projects, nonresidents who in turn would take the places on private and out-of-state projects of the Illinoians who had replaced them on Illinois public projects. But the fact that a state's tariff might have only a small effect on interstate trade would not save it from invalidation under the commerce clause; the cumulative effects of many states' modest tariffs could be staggering.

However, serious doubt is cast on the legal validity of our tariff analogy by a series of Supreme Court decisions, culminating in *White v. Massachusetts Council of Construction Employers, Inc.*, 460 U.S. 204, 103 S.Ct. 1042, 75 L.Ed.2d 1 (1983), which distinguish between the state's role as a participant in, and as the regulator of, a market. White, the Mayor of Boston, had issued an executive order requiring that at least half the workers on every construction project financed, in whole or part, or administered, by the City of Boston be Boston residents. The Court upheld the order. "If the city is a market participant, then the Commerce Clause establishes no barrier to conditions such as these which the city demands for its participation. Impact on out-of-state residents figures in the equation only after it is decided that the city is regulating the market rather than participating in it, for only in the former case need it be determined whether any burden on interstate commerce is permitted by the Commerce Clause." 460 U.S. at ——, *Id.* at 1046. So if in our coal hypothetical the State of Illinois subsidized the electrical generating plants in Illinois that buy coal, it could, without violating the commerce clause, forbid them to buy coal produced out of state.

At first glance the "market participant" concept may seem inappropriately to equate public agencies with private firms; for the state, in its proprietary or market-participant capacity, may be influenced by the same protectionist motives that but for the negative commerce clause might lead it to erect explicit tariff barriers to goods or labor from out of state. But a more realistic explanation of the concept emphasizes the freedom that states have under the Constitution to provide, often selectively, for the welfare of their residents. There are a thousand devices by which the State of Illinois could if it wanted subsidize the

state's coal miners; many would have the same effects on both residents and nonresidents as a subsidy for purchasers of coal who limit their purchases to Illinois; yet the courts could not prevent all of them.

 In any event, if the State of Illinois had limited the preference law to construction projects financed (in whole or part) or administered by the state, it would be clear after *White* that the law did not violate the commerce clause. But the state has gone further. The preference law applies to every public construction contract in Illinois, even if the purchaser is a local school board, or for that matter the local dog catcher. Of course for many purposes, including many federal purposes such as those behind the due process and equal protection clauses of the Fourteenth Amendment, every local government unit in Illinois is a part of the state government; but maybe not for the purpose of evaluating Illinois' preference law under the commerce clause. Government in Illinois as in all states is decentralized, and local school boards such as that of Decatur which let the contract in issue in this case have substantial autonomy, including authority to levy taxes to support the schools. See Ill.Rev.Stat.1981, ch. 122, ¶¶ 17–11 to 17–13; *Quality Education for All Children, Inc. v. School Bd.*, 385 F.Supp. 803, 820 (N.D.Ill.1974). True, the order upheld in *White* embraced projects that the City of Boston financed in part as well as those that it financed 100 percent or administered. But according to the school superintendent's uncontradicted affidavit in this case, the window-replacement project is not even partially financed by the state; neither is it being administered by the state. The "market participant" is the school board, just as the market participant in *White* was the City of Boston. The state is a regulator, telling thousands of local government units that they must not give construction contracts to employers of nonresidents. It is particularly important to insist on the distinction because *White* prevents any consideration of impact on interstate commerce until the state is found to

be a regulator of rather than a participant in the market.

 Against the validity of the distinction, however, may be cited the Supreme Court's summary affirmance of *American Yearbook Co. v. Askew*, 339 F.Supp. 719, 723–25 (M.D.Fla.) (three-judge district court), aff'd mem., 409 U.S. 904, 93 S.Ct. 230, 34 L.Ed.2d 168 (1972), which held that a state statute requiring all public printing to be done within the state did not violate the commerce clause. Although the district court did not discuss local government (the only public agencies involved in the case were state universities), it assumed that the statute would apply to a printing contract let by a school board or other local government agency, and was untroubled by this. See 339 F.Supp. at 724. But summary affirmance does not commit the Supreme Court to the details of the lower court's opinion. *Zobel v. Williams*, 457 U.S. 55, 64 n. 13, 102 S.Ct. 2309, 2315 n. 13, 72 L.Ed.2d 672 (1982). And although the Supreme Court cited *Askew* with approval in a recent "market participant" case, *Reeves, Inc. v. Stake, supra*, 447 U.S. at 437 n. 9, 100 S.Ct. at 2277 n. 9, that case did not involve a state's attempting to impose home-state preference on a local government entity either; nor was this aspect of *Askew* even mentioned. The Court in the same footnote cited with approval two state cases upholding statutes requiring home-state preference by county as well as state agencies, *State ex rel. Collins v. Senatoba Blank Book & Stationery Co.*, 115 Miss. 254, 76 So. 258 (1917), and *Denver v. Bossie*, 83 Colo. 329, 334, 266 Pac. 214, 217 (1928), as well as the pages in *Bleigh* in which the Illinois preference law was held valid under the commerce clause. See also Note, *Home-State Preferences in Public Contracting: A Study in Economic Balkanization*, 58 Ia.L.Rev. 576 (1973). But in none of the cited cases was the difference between the state's own purchasing and that of its local governmental units discussed. It would be unrealistic to suppose that merely citing a case commits the Supreme Court to everything in the cited opinion, and impertinent to suppose

that citation is a deliberate technique for resolving—*sub rosa*—difficult and important questions not raised or argued in the case actually before the Court.

The difference between the state's preferring state residents in its own dealings and forcing local agencies to do so in theirs is both analytical and quantitative. When the project on which the state impresses a home-state preference is undertaken by a unit of local government without any state financial support or supervision, the state is not a participant in the project but a regulator. And since more public contracting in the states is done at the local level, by cities, school districts, park districts, counties, etc., than at the state level, extending *Reeves* and *White* to cases where the state's relationship to its local agencies is purely regulatory could do great damage to the principles of free trade on which the negative commerce clause is based.

 Even if a law interferes with free trade, however, the state may be able to justify it on one ground or another. It can keep out diseased cattle, see *Asbell v. Kansas*, 209 U.S. 251, 28 S.Ct. 485, 52 L.Ed. 778 (1908); *Illinois v. General Elec. Co.*, 683 F.2d 206, 214 (7th Cir.1982)—so why not nonresidents who impose a cost on the state by taking jobs away from residents and thereby forcing them onto the unemployment or welfare rolls, which the state finances in part? And even if the state had no financial stake, would it not have a legitimate interest in protecting its residents from such adversity? But if preferring the welfare of residents (more precisely, of some residents—others, notably consumers, invariably suffer from import restrictions) to that of nonresidents were a good defense under the commerce clause, explicit tariffs would be permissible. *Baldwin v. G.A.F. Seelig, Inc., supra,* 294 U.S. at 522, 55 S.Ct. at 500, held that it is not a good defense. *City of Philadelphia v. New Jersey*, 437 U.S. 617, 98 S.Ct. 2531, 57 L.Ed.2d 475 (1978), held that a state could not confine the use of its landfill waste dumps to its residents. Change "landfill waste dumps" to "public construc-

tion projects" and you have this case. In any event, more than assertion would be necessary to create a persuasive analogy from the quarantine cases; and as we shall see when we discuss the privileges and immunities clause, Illinois has presented no facts relating to actual or probable as opposed to purely conjectural harms from allowing nonresidents to work on public construction projects in Illinois. We conclude that the Illinois preference law violates the commerce clause.

 We shall now consider whether it also violates the privileges and immunities clause of Article IV. Normally it would be otiose, or worse, for a court to decide a constitutional question unnecessarily; and the judgment in this case must be the same whether the preference law violates one constitutional provision or many. But it may avoid the necessity of a remand should review of our decision be sought and granted and the Supreme Court disagree with our interpretation of the commerce clause for us to rule on the district court's alternative ground for invalidating the preference law; this may also help the Supreme Court decide whether the case merits further review (technically, since the state has a right of appeal under 28 U.S.C. § 1254(2), whether it raises a substantial federal question). Cf. *Illinois v. General Electric Co., supra,* 683 F.2d at 214. Moreover, the commerce clause and the privileges and immunities clause are so closely related in a case of this kind (see *Hicklin v. Orbeck, supra,* 437 U.S. at 531–32, 98 S.Ct. at 2490–91) that it would be artificial to ignore one of them. Indeed, there is a respectable argument that the framers of the Constitution intended the privileges and immunities clause to play the role that has come to be played instead by the negative commerce clause. See Eule, *supra,* 91 Yale L.J. at 447–48. We could not be sure that the preference law does not pass constitutional muster under either clause without considering cases under both, as the Supreme Court did in *Hicklin,* 437 U.S. at 532–34, 98 S.Ct. at 2490–92.

■ The privileges and immunities question was not addressed in *White*, the Court merely remarking that since the preference was for residents of a city rather than of the state the victims were not limited to out-of-state residents. See 460 U.S. at —— n. 12, 103 S.Ct. at 1048 n. 12. We add: almost certainly the principal victims of the mayor's executive order were workers living in the Boston suburbs, which are in Massachusetts, and these workers had political remedies against the order that nonresidents of the state did not have. Nevertheless, the Supreme Court held in *United Bldg. & Construction Trades Council v. Mayor & Council of Camden, supra*, that an ordinance similar to that in *White* was prima facie unlawful under the privileges and immunities clause. We think the Illinois preference law must equally (or more, as we shall see presently) be deemed prima facie unlawful under the clause. Although *Hicklin* (the "Alaska Hire" case) is, as we noted earlier, factually distinguishable from the present case, it too suggests the prima facie invalidity of the Illinois preference law. There are no figures in the very sparse record of this case; but public construction projects in the State of Illinois, like projects related to state oil and gas leases in Alaska, must constitute in the aggregate a substantial employment opportunity that at least some nonresidents (besides the three individual Missourians who are plaintiffs in the case) are able, willing, and maybe even eager to take advantage of, since major centers of economic activity in the state, notably Chicago and East St. Louis, are adjacent to large population centers in other states. And the consequences for nonresidents must be much greater than those of the Camden ordinance at issue in the *United Bldg. & Construction* case.

■ It is true despite the unqualified language of the privileges and immunities clause that states may keep out nonresidents if they constitute a "peculiar source of evil." *United Bldg. & Construction Trades Council v. Mayor & Council of Camden, supra,* —— U.S. at ——, 104 S.Ct. at 1029, quoting *Toomer v. Witsell, supra,* 334 U.S. at 398, 68 S.Ct. at 1163. On this ground a state could keep out nonresidents who had been exposed to some communicable disease of which the state was still substantially free. It could even deal with "free riding" nonresidents, for example by charging higher tuition to nonresidents attending the state university than to residents. See *Martinez v. Bynum*, 461 U.S. 321, —— and n. 6, 103 S.Ct. 1838, 1842 and n. 6, 75 L.Ed.2d 879 (1983), and cases cited there. In both of these examples the justification for the state's discriminating against nonresidents is obvious. But the benefits of Illinois' home-preference law, enacted in 1939 and not amended since, cannot be assumed. Otherwise both the "Alaska Hire" law and the Camden residents-preference ordinance would have been upheld.

■ True, the intimation in *Hicklin*, 437 U.S. at 526, 98 S.Ct. at 2487, based on strong language in *Ward v. Maryland*, 79 U.S. (12 Wall.) 418, 430, 20 L.Ed. 449 (1871), that unemployment may never be a valid ground for discriminating against nonresidents can no longer be considered authoritative. The Court in *United Bldg. & Construction* not only allowed the City of Camden to attempt to justify the discrimination but quoted from *Toomer* the statement that "the states should have considerable leeway in analyzing local evils and in prescribing appropriate cures." 334 U.S. at 396, 68 S.Ct. at 1162, quoted at —— U.S. ——, 104 S.Ct. 1029. Still, *Hicklin* and *United Bldg. & Construction* make clear that there must be *some* evidence of the benefits of a residents-preference law in dealing with a problem created by nonresidents, and Illinois has presented none. We do not just mean that it has failed to put in "evidence" in the technical legal sense, though it has failed; such evidence is not essential when the issue is not the application but the validity of a statute. Illinois has presented no information—statistical or otherwise, evidentiary or subject

to judicial notice, at trial or on appeal—concerning the benefits of the preference law. We are not told the unemployment rate in Illinois' construction industry, what such unemployment costs the state, whether it would be significantly increased by throwing open public construction projects to nonresidents (which might just cause a reshuffling of jobs between public and private projects), and whether the costs—if any—to Illinois of allowing nonresident labor on such projects, costs in higher unemployment or welfare benefits paid unemployed construction workers or their families, are likely to exceed any cost savings in public construction from hiring nonresident workers.

Our insistence on data may seem niggling, and would be if the effects of allowing nonresidents to work on public construction projects were as clear as those of allowing carriers of Bubonic plague to enter the state without quarantine or nonresident students to attend the University of Illinois free of charge. But they are not as clear. The preference law might have no effect on the unemployment rate in Illinois. Worse, it could boomerang, and actually increase unemployment in the construction industry. Suppose for example that a public construction project would cost $1 million if it employed both Illinois residents and nonresidents and $1.2 million if it employed only Illinois residents. If the higher price were more than the school district or other public agency was willing to pay, the project would not be authorized and the Illinois residents who would have worked on it would have to seek work elsewhere.

■ Although the burden of proving that a state statute violates the privileges and immunities clause is on the plaintiff, once he shows that the statute discriminates explicitly against nonresidents in "the pursuit of common callings," *Baldwin v. Montana Fish & Game Comm'n*, 436 U.S. 371, 387, 98 S.Ct. 1852, 1862, 56 L.Ed.2d 354 (1978), the state has the burden of justifying the discrimination, see *id.* at 402, 98 S.Ct. 1870 (dissenting opinion); *United Bldg. & Construction Trades*

*Council v. Mayor & Council of Camden, supra,* —— U.S. ——, 104 S.Ct. 1029; *Hicklin v. Orbeck, supra,* 437 U.S. at 526–27, 98 S.Ct. at 2487–88. Tribe, American Constitutional Law 411 (1978), or, at the very least, of producing some evidence in justification of it (the burden of persuasion may remain on the plaintiff). After *Hicklin*, and the recent spate of state court cases invalidating, on the authority of *Hicklin*, preference laws much like Illinois', see *Laborers Local Union No. 374 v. Felton Construction Co.,* 98 Wash.2d 121, 654 P.2d 67 (1982); *Neshaminy Constructors, Inc. v. Krause, supra,* and *Salla v. County of Monroe,* 48 N.Y.2d 514, 423 N.Y.S.2d 878, 399 N.E.2d 909 (1979), Illinois must have known that it could not justify the exclusion of nonresidents from employment on all public construction projects without making a better showing of justification than the State of Alaska had been able to make for the "Alaska Hire" law. In fact Alaska made a manful effort at justification, though it fell short. Illinois has made none in this proceeding, though the director of its own Labor Department, who had access to the data that might illuminate the costs and benefits of the law, was the defendant.

The remand in *United Bldg. & Construction* does not warrant a similar remand here. The City of Camden had had no opportunity to make a case for justifying the ordinance. The ordinance had been submitted for approval to a New Jersey affirmative action officer, and after "brief administrative proceedings" had been designated as a state-approved affirmative action construction program. An association of labor organizations filed a notice of appeal to a New Jersey appellate court which in turn certified the question of the ordinance's legality to the New Jersey Supreme Court. —— U.S. ——, 104 S.Ct. at 1023–24. In the present case the state had a full opportunity in the preliminary-injunction proceeding in the district court to put into evidence (or ask the court to take judicial notice of) facts justifying the preference law. It did nothing.

The judgment of the district court is AFFIRMED.