**BIG COUNTRY FOODS, INC., an Alaska corporation, Plaintiff–Appellant,**

v.

**BOARD OF EDUCATION OF the ANCHORAGE SCHOOL DISTRICT, ANCHORAGE, ALASKA; United States Department of Agriculture, an Agency of the United States of America; Edward R. Madigan,* Individually and as Secretary of the United States Department of Agriculture; William Demmert, as Commissioner of Education for the State of Alaska, Defendants–Appellees.**

No. 91–35087.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Dec. 5, 1991.

Decided Jan. 3, 1992.

---

* Clayton Yeutter, Secretary Richard E. Lyng's successor as Secretary of Agriculture, was automatically substituted for Lyng by the district court. Edward R. Madigan is now substituted for Yeutter as Secretary of Agriculture pursuant to Fed.R.App.P. 43(c).

Sema E. Lederman, Hansen & Lederman, Anchorage, Alaska, for plaintiff-appellant.

Michael E. Robinson, Dept. of Justice, Washington, D.C., for federal appellees.

Sarah J. Felix, Asst. Atty. Gen., Juneau, Alaska, for state appellee.

Before WRIGHT, THOMPSON and T.G. NELSON, Circuit Judges.

DAVID R. THOMPSON, Circuit Judge:

## OVERVIEW

Big Country Foods, Inc. ("Big Country") filed a complaint in the district court in Alaska seeking a declaratory judgment that Alaska Statute (AS) § 36.15.050 violates the commerce clause of the United States Constitution, because it gives a 7% bidding preference to Alaska milk harvesters in contracting to supply milk to school districts in Alaska. Big Country also claims that this in-state preference violates federal statutes requiring open and free competition among suppliers of products under the National School Breakfast Program, 42 U.S.C. § 1771 et seq., the National School Lunch Program, 42 U.S.C. § 1751 et seq., and regulations promulgated by the United States Secretary of Agriculture.

The district court denied Big Country's request for a preliminary injunction. Big Country appealed and we affirmed. *Big Country Foods v. Board of Education*, 868 F.2d 1085 (9th Cir.1989). The district court then granted summary judgment for the federal defendants and dismissed all claims against all defendants. Big Country appeals. We have jurisdiction under 28 U.S.C. § 1291 and we affirm.

## FACTS AND PROCEDURE [1]

The Anchorage School District ("school district") receives, via the State of Alaska, federal funds for the purchase of milk for Anchorage school children. Federal funds are granted to the state of Alaska as a voluntary participant in the Federal School Breakfast Program, 42 U.S.C. § 1771 et seq., and the National School Lunch Program, 42 U.S.C. § 1751 et seq. Participants in these federal programs are required to procure milk "in a manner that provides maximum open and free competition." 7 C.F.R. § 3015.182 (1991). Federal regulations also require that a fair share of contracts using Federal School Breakfast and Lunch program funds be awarded to small and minority businesses and that program recipients take "affirmative steps . . .

to assure that small and minority businesses are utilized when possible as sources of supplies." OMB Circular A–102, Attachment O, ¶ 9 (1979).

Big Country is a small, women-owned business. It distributes milk harvested in the State of Washington. It was the successful bidder for the contract to supply milk to the school district in five of the last eight years before the enactment of AS § 36.15.050.

In May 1988, Big Country submitted a bid of $360,000 for the contract to supply milk to the school district for the 1988–89 school year. Two other suppliers, Northern Dairies and Matanuska Maid Dairy ("Matanuska"), submitted bids of $384,625 and $385,000 respectively. The Alaska preference statute, AS § 36.15.050(a), requires schools receiving state funds to buy dairy products harvested in the State of Alaska if the price is no more than 7% higher than products of like quality harvested outside the state. Pursuant to this statute, the contract was awarded to Matanuska, a supplier of Alaska-harvested milk. Matanuska is owned by the State of Alaska.

Before awarding the contract to Matanuska, the school district received a letter from a Department of Agriculture official informing it that procurements made pursuant to the Alaska preference statute "are not prohibited" by applicable federal regulations. Since that time, the school district has applied the Alaska preference statute to all bidding and has not awarded the milk supply contract to Big Country.

## DISCUSSION

A. Asserted Violation of Federal Regulations

Big Country argues that AS § 36.15.050 conflicts with controlling federal regulations requiring "maximum open and free competition" in the procurement of supplies under the federal School Breakfast and Lunch Programs, 7 C.F.R. § 3015.182, and regulations requiring that a fair share of contracts under the programs be award-

---

1. Portions of this statement of facts appeared in *Big Country Foods*, 868 F.2d at 1086–87.

ed to small and minority businesses. OMB Circular A–102, Attachment O, ¶ 9.

■ The federal appellees contend Big Country does not have standing to contest the federal government's or the state's alleged failure to follow these federal regulations. Big Country counters that the federal appellees did not cross-appeal this issue in a timely manner.

"Standing is a necessary element of federal-court jurisdiction." *City of S. Lake Tahoe v. California Tahoe Regional Planning Agency*, 625 F.2d 231, 233 (9th Cir. 1980), *cert. denied*, 449 U.S. 1039, 101 S.Ct. 619, 66 L.Ed.2d 502 (1980). Thus, we must consider the standing issue. *Id.*

■ It is well settled that a "disappointed bidder" has standing to challenge a federal agency's illegal award of a contract. *Scanwell Lab. v. Shaffer*, 424 F.2d 859 (D.C.Cir.1970). Most circuits have adopted the *Scanwell* rule. *National Federation of Fed. Employees v. Cheney*, 883 F.2d 1038, 1052 n. 29 (D.C.Cir.1989), *cert. denied*, — U.S. ——, 110 S.Ct. 3214, 110 L.Ed.2d 662 (1990) (citing cases). *See also Armstrong & Armstrong v. United States*, 514 F.2d 402, 403 (9th Cir.1975). Congress has indicated an intent to retain the *Scanwell* rule. S.Rep. No. 275, 97th Cong., 2nd Sess. 23, *reprinted in* 1982 U.S.Code Cong. & Admin.News, 11, 33.

The *Scanwell* rule, however, does not apply to a *state* agency's illegal award of a contract under federal procurement policy. *See Sowell's Meats & Servs. v. McSwain*, 788 F.2d 226, 228 n. 2 (4th Cir.1986); *Estey Corp. v. Matzke*, 431 F.Supp. 468, 470 (N.D.Ill.1976).[2] Further, the Administrative Procedure Act does not provide a basis for review of a claim against a state agency, because such an agency is not an "authority of the Government of the United States" under 5 U.S.C. § 701(b)(1). *See City of Rohnert Park v. Harris*, 601 F.2d 1040, 1048 (9th Cir.1979), *cert. denied*, 445 U.S. 961, 100 S.Ct. 1647, 64 L.Ed.2d 236 (1980). Thus, Big Country has no standing to challenge the state's failure to follow federal regulations.

■ Nor does Big Country have standing to challenge the Department of Agriculture's decision not to enforce the regulations against Alaska. "An agency's decision not to take enforcement action should be presumed immune from judicial review under [5 U.S.C.] § 701(a)(2). For good reasons, such a decision has traditionally been 'committed to agency discretion'...." *Heckler v. Chaney*, 470 U.S. 821, 832, 105 S.Ct. 1649, 1656, 84 L.Ed ?d 714 (1985). This presumption, however, is rebuttable. It may be rebutted by proof that Congress intended to limit an agency's enforcement discretion, "either by setting substantive priorities, or by otherwise circumscribing an agency's power to discriminate among issues or cases it will pursue." *Id.* at 833, 105 S.Ct. at 1656–57.

Here, Congress did not limit the enforcement powers of the Secretary of the Department of Agriculture in administering the school food programs. Under 42 U.S.C. § 1779, the Secretary "shall prescribe such regulations as the Secretary may deem necessary to carry out this chapter and the National School Lunch Act."

Further, the Secretary's own regulations do not limit his enforcement discretion. *See* 7 C.F.R. § 210.24 (1991) ("[w]henever it is determined that a State agency has materially failed to comply with the provisions of this part, or with FNS [Food and Nutrition Service] guidelines and instructions, FNS may suspend or terminate the Program in whole, or in part, or take any other action as may be available and appropriate"); 7 C.F.R. § 220.18 (1991) (same); 7 C.F.R. § 3015.123–3015.124 ("the awarding agency may ... suspend the grant in whole or in part").

Finally, none of the possible exceptions to the presumption of unreviewability set out in *Chaney* applies here. This is not a case where an agency has refused to insti-

---

2. Big Country does not allege that the State of Alaska's actions violated its constitutional rights to due process or equal protection. We therefore need not examine whether Alaska law creates a property interest for an unsuccessful bidder on a state contract. *See Buckley Constr., Inc. v. Shawnee Civic & Cultural Dev. Auth.*, 933 F.2d 853, 857–88 (10th Cir.1991).

tute proceedings based solely on the belief that it lacks jurisdiction. *Heckler v. Chaney,* 470 U.S. at 833 n. 4, 105 S.Ct. at 1656 n. 4. Nor do we have a situation where it could justifiably be said that the agency has "consciously and expressly adopted a general policy" that is so extreme as to amount to an abdication of its statutory responsibilities. *Id.* Moreover, the express provisions for enforcement of federal standards by the Secretary foreclose an implied private right of action. *Sowell's Meats,* 788 F.2d at 229.

We therefore conclude that Big Country may not challenge either the State of Alaska's alleged failure to follow federal procurement regulations, or the Department of Agriculture's alleged failure to enforce those regulations against Alaska.

**B. Constitutionality of AS § 36.15.050**

Big Country contends that AS § 36.15.050 violates the commerce clause of the United States Constitution because it discriminates in favor of in-state milk harvesters and against out-of-state milk harvesters.

"It has long been accepted that the Commerce Clause not only grants Congress the authority to regulate commerce among the States, but also directly limits the power of the States to discriminate against interstate commerce." *New Energy Co. of Indiana v. Limbach,* 486 U.S. 269, 273, 108 S.Ct. 1803, 1807, 100 L.Ed.2d 302 (1988). This limitation on state power is the so-called "dormant commerce clause." It "prohibits economic protectionism—that is, regulatory measures designed to benefit in-state economic interests by burdening out-of-state competitors." *Id.* at 273–74, 108 S.Ct. at 1807. Measures that discriminate against interstate commerce in this fashion are routinely struck down, "unless the discrimination [they impose] is demonstrably

justified by a valid factor unrelated to economic protectionism." *Id.* at 274, 108 S.Ct. at 1807; *Maine v. Taylor,* 477 U.S. 131, 106 S.Ct. 2440, 91 L.Ed.2d 110 (1986).

There is no question that Alaska's preference statute discriminates against interstate commerce. The statute mandates a preference for agricultural products harvested in Alaska "whenever priced no more than seven percent above products harvested outside the state, available, and of like quality compared with agricultural products harvested outside the state." AS § 36.15.050(a). Neither Alaska nor the federal appellees cites any reason for the statute's existence other than economic protectionism for Alaska's milk harvesters. Nevertheless, they argue the statute is valid on the basis of the "market participant" exception to the dormant commerce clause.[3]

"[I]f a State is acting as a market participant, rather than as a market regulator, the dormant Commerce Clause places no limitation on its activities." *South–Central Timber Dev. v. Wunnicke,* 467 U.S. 82, 93, 104 S.Ct. 2237, 2243, 81 L.Ed.2d 71 (1984) (plurality opinion). *See also White v. Massachusetts Council of Constr. Employers,* 460 U.S. 204, 206–08, 103 S.Ct. 1042, 1043–45, 75 L.Ed.2d 1 (1983); *Reeves, Inc. v. Stake,* 447 U.S. 429, 436–37, 100 S.Ct. 2271, 2277, 65 L.Ed.2d 244 (1980); *Hughes v. Alexandria Scrap Corp.,* 426 U.S. 794, 810, 96 S.Ct. 2488, 2498, 49 L.Ed.2d 220 (1976).

Big Country argues that Alaska is not a market participant. In support of this argument, Big Country asserts: (1) the Alaska statute is not limited to state purchases of milk, but rather provides for state regulation by requiring local school boards to make the milk purchases; (2) the milk purchases, while made by the local school districts, are paid for with federal funds; and

---

**3.** The Ninth Circuit has considered the "market participant" exception four times and rejected it each time. *See Hydrostorage, Inc. v. Northern Ca. Boilermakers Local Joint Apprenticeship Comm.,* 891 F.2d 719 (9th Cir.1989), *cert. denied,* —— U.S. ——, 111 S.Ct. 72, 112 L.Ed.2d 46 (1990); *Shell Oil Co. v. City of Santa Monica,* 830 F.2d 1052 (9th Cir.1987), *cert. denied,* 487

U.S. 1235, 108 S.Ct. 2901, 2902, 101 L.Ed.2d 934 (1988); *Western Oil & Gas Ass'n v. Cory,* 726 F.2d 1340 (9th Cir.1984), *aff'd,* 471 U.S. 81, 105 S.Ct. 1859, 85 L.Ed.2d 61 (1985); *Washington State Bldg. & Constr. Trades Council v. Spellman,* 684 F.2d 627 (9th Cir.1982), *cert. denied,* 461 U.S. 913, 103 S.Ct. 1891, 77 L.Ed.2d 282 (1983).

(3) the state is acting in its "sovereign capacity" in directing its school districts to give the 7% bidding preference to in-state milk harvesters. As explained below, we reject these arguments.

### 1. *Market Participation or Regulation*

The line between state market participation and state regulation is a fuzzy one that has perplexed courts and commentators alike. *See* Dan T. Coenen, *Untangling the Market–Participant Exemption to the Dormant Commerce Clause*, 88 Mich.L.Rev. 395 (1989). *See also* Laurence H. Tribe, *American Constitutional Law* § 6–11 (2d ed. 1988); Karl Manheim, *New–Age Federalism and the Market Participant Doctrine*, 22 Ariz.St.L.J. 559 (1990).

The Supreme Court has held that South Dakota could restrict the sale of cement from a state-owned plant to state residents, *Reeves*, and that the City of Boston could require all construction contracts funded in whole or in part by city funds or city-administered federal funds to be performed by a work force of at least 50% City of Boston residents. *White.* The Court has struck down an Alaska regulation requiring that timber taken from state lands be processed within the state prior to export, *Wunnicke*, and an Ohio statute awarding tax credits for each gallon of ethanol sold by fuel dealers if the ethanol was produced in Ohio or another state with a similar tax credit scheme. *Limbach.*

In making the determination whether a state is acting as a market participant or regulator, a court must examine whether the state or local government has imposed restrictions that "reach beyond the immediate parties with which the government transacts business." *White*, 460 U.S. at 211 n. 7, 103 S.Ct. at 1046 n. 7. *See also Wunnicke*, 467 U.S. at 95, 104 S.Ct. at 2244. In *White*, the Court held that the City of Boston did not reach beyond the immediate parties by requiring contractors to hire local workers because everyone af-

fected by the order was, "in a substantial if informal sense, 'working for the city.'" *White*, 460 U.S. at 211 n. 7, 103 S.Ct. at 1046 n. 7. In contrast, the Court in *Wunnicke* found that the Alaska timber processing requirement constituted a "downstream" regulation prohibited by the commerce clause. *Wunnicke*, 467 U.S. at 95, 104 S.Ct. at 2244.

In the present case, Big Country contends the State of Alaska has imposed a "downstream" requirement by forcing school districts to enter into contracts on terms set by state regulation. The state and federal appellees contend the school districts are political subdivisions of the state, and as such they should be regarded as part of the state for purposes of this discussion. Given this relationship, they argue, the statute merely tells how the state will spend its own funds.[4]

This circuit has not confronted the issue whether the market participant exception can apply to a state statute requiring its political subdivisions to favor state residents in the procurement or sale of goods. Other circuits have split on the issue.

In *W.C.M. Window Co. v. Bernardi*, 730 F.2d 486 (7th Cir.1984), the Seventh Circuit held that the market participant exception did not apply to an Illinois state regulation that required contractors on any public works project or improvement for the State of Illinois or any political subdivision to employ only Illinois laborers to the extent they were available. The *W.C.M. Window* court noted that for many purposes local government is considered part of the state government, *id.* at 495, but it refused to consider local government part of the state government for commerce clause purposes.

> The difference between the state's preferring state residents in its own dealings and forcing local agencies to do so in theirs is both analytical and quantitative. When the project on which the state impresses a home-state preference is undertaken by a unit of local govern-

---

**4.** We reject the federal appellees' argument that the local school district should be considered "a market participant in its own right." The school district acted pursuant to state law, and did not seek to give an in-state preference on its own as the City of Boston did in *White. White*, 460 U.S. at 205–06, 103 S.Ct. at 1043–44 (city acted on its own through mayor's executive order).

ment without any state financial support or supervision, the state is not a participant in the project but a regulator. And since more public contracting in the states is done at the local level, by cities, school districts, park districts, counties, etc. than at the state level, extending *Reeves* and *White* to cases where the state's relationship to its local agencies is purely regulatory could do great damage to the principles of free trade on which the negative commerce clause is based. *Id.* at 496. After holding that the market participant exception did not apply, the court struck down the Illinois statute as unconstitutional. It noted that the result might be different if the state was mandating how state, and not school board, funds would be spent. *Id.* at 495.

In contrast to *W.C.M. Window,* the Third Circuit in *Trojan Technologies, Inc. v. Commonwealth of Pennsylvania,* 916 F.2d 903 (3d Cir.1990), *cert. denied,* —— U.S. ——, 111 S.Ct. 2814, 115 L.Ed.2d 986 (1991), applied the market participant exception to a Pennsylvania statute requiring political subdivisions to buy American-made steel in connection with a public works project. The court disagreed explicitly with *W.C.M. Window.* It found no compelling analytical difference for market participant analysis between a local government unit and central state agencies, to which the exception definitely applies. *Id.* at 911. "Both exist only through affirmative acts of the state. A municipality derives its authority from the state." *Id.* Relying on the statement in *White* that private employees were in a sense "working for the city," 460 U.S. at 211 n. 7, 103 S.Ct. at 1046 n. 7, the *Trojan Technologies* court stated it was equally clear that suppliers of a local public entity can be thought to be "supplying for the state." 916 F.2d at 911.

We agree with the Third Circuit in *Trojan Technologies.* Political subdivisions generally exist at the will of the state. *City of Inglewood v. City of Los Angeles,* 451 F.2d 948, 954 (9th Cir.1971); *see also*

*Trojan Technologies,* 916 F.2d at 911; Osborne M. Reynolds, *Local Government Law* §§ 27, 174 (1982 & Supp.1990) (discussing "complete control" by states of municipalities and state control of education). A state should not be penalized for exercising its power through smaller, localized units; local control fosters both administrative efficiency and democratic governance.

A rule that would consider *all* political subdivisions as separate from state control for market participant purposes would be anomalous to the proposition that political subdivisions exist at the will of the state. A rule that would consider *some* political subdivisions as separate from state controls would lead to difficult case-specific inquiries into the degree of subdivision autonomy. For example, the *W.C.M. Window* court's reliance on the "substantial autonomy" of local school boards in the decentralized government of Illinois, *W.C.M. Window,* 730 F.2d at 495, led the parties here to argue over the extent of Alaska state control of the local school districts.

We conclude the market participant exception may apply notwithstanding Alaska's use of its school districts to implement its milk purchase program.

### 2. *Federal Funds*

■ Big Country argues that neither Alaska nor the school district can be considered a market participant because federal funds pay for all of the milk.[5] Big Country notes that in *White* the Supreme Court drew a distinction between construction projects funded wholly with city funds and projects funded in part with federal funds. *White,* 460 U.S. at 209, 103 S.Ct. at 1045. Based on this distinction, Big Country argues that the market participant exception is inapplicable to federally funded projects. We reject this argument.

The *White* Court found it unnecessary to examine the market participant exception

---

**5.** Although the funds for the milk arrive in the hands of the school districts from the State of Alaska through a complicated financial process involving letters of credit from the USDA and reimbursements, federal funds ultimately pay for the milk.

because in that case the government had "affirmatively sanctioned" the expenditure of federal funds to achieve the local protectionist action taken by the City of Boston. *Id.* at 215, 103 S.Ct. at 1045. "Where state or local government action is specifically authorized by Congress, it is not subject to the Commerce Clause even if it interferes with interstate commerce." *Id.* at 213, 103 S.Ct. at 1047. In the absence of such congressional approval, and there is none in this case, *White* commands "a single inquiry: whether the challenged 'program constituted direct state participation in the market.'" *White,* 460 U.S. at 208, 103 S.Ct. at 1044–45 (quoting *Reeves,* 447 U.S. at 436 n. 7, 100 S.Ct. at 2277 n. 7.). Here, Alaska's program constitutes direct state participation in the market.

In implementing its program to buy milk for its schools, Alaska commits itself to the terms of its annual milk supply contracts, including the obligation to pay for the milk. It also administers the acquisition and disbursement of milk funds through a maze of credits and reimbursements. Federal funds provide the wherewithal to make the milk purchases, but it is Alaska that is the direct participant in the market. Accordingly, the market participant exception applies.

By this holding, we join the only other federal circuit court to consider the effect of federal funds in the market participant context. The Third Circuit in *Swin Resource Sys. v. Lycoming County,* 883 F.2d 245, 250 (3d Cir.1989), *cert. denied,* 493 U.S. 1077, 110 S.Ct. 1127, 107 L.Ed.2d 1033 (1990), applied the market participant exception to defeat a commerce clause attack on protectionist practices which favored local waste disposers in the operation of a county landfill. The landfill was on federal land and, in part, had been built and started with federal funds. The court summarily rejected, on the basis of *White,* the argument that the presence of federal funding made the market participant exception inapplicable. *Id.*

We recognize there are strong public policy arguments to the contrary. *See* Dan T. Coenen, *supra,* at 441. It may be asserted

with some logic that the use of federal as opposed to state or local funding allows Alaska to reap what it has not sown; that the underlying commerce clause value of a free market is undermined when the federal government in essence subsidizes one state's industry; and that a state differs from the usual market participant in that the state has the ability to obtain federal subsidies for its purchases. *Cf. id.* These arguments, however, extend the debate beyond the "single inquiry" the Supreme Court demands: "whether the challenged 'program constituted direct state participation in the market.'" *White,* 460 U.S. at 208, 103 S.Ct. at 1044–45 (quoting *Reeves,* 447 U.S. at 436 n. 7, 100 S.Ct. at 2277 n. 7.). Here, Alaska is a direct participant in the market. Accordingly, its use of federal funds to pay for its milk purchases does not deprive it of the market participant exception to the dormant commerce clause.

### 3. *State Sovereignty*

■ Finally, Big Country argues that the State of Alaska is acting in its sovereign capacity, rather than as a market participant, in directing its school districts to give the 7% bidding preference to in-state milk harvesters, and thus the market participant exception is inapplicable. We disagree.

In *Limbach,* the Supreme Court held that the market participant exception did not apply to Ohio's decision to award a tax credit for each gallon of ethanol sold in the state that was also produced in the state. "The Ohio action ultimately at issue is neither its purchase nor its sale of ethanol, but its assessment and computation of taxes—a primeval governmental activity." *Limbach,* 486 U.S. at 277, 108 S.Ct. at 1809. When the state or its subdivision acts in a "distinctive governmental capacity," the exception does not apply. *Id.*

Big Country argues that when Alaska buys milk for its schools it acts in its distinctive governmental capacity as a provider of public education and therefore is not entitled to the market participant exception. In its view, Alaska is no different from the state of California controlling tidelands and submerged lands in *Cory,*

726 F.2d 1340, or the City of Santa Monica setting franchise fees for easements under public streets in *Shell Oil,* 830 F.2d at 1057.

*Limbach, Cory,* and *Shell Oil* are clearly distinguishable. Here, the state, through its school districts, is simply making a decision as to what it will pay for a product bought on the open market. The state does not regulate whether private actors can buy harvested milk at a certain price, it does not impose any taxes, and there is no evidence that it has a near monopoly (or, in the case of a buyer, monopsony) position in the purchase of milk within the state. To accept Big Country's reasoning would make the "sovereign capacity" concept virtually swallow up the "market participant" exception.

## CONCLUSION

Big Country lacks standing to contest the State of Alaska's alleged failure to follow federal procurement regulations, or the Department of Agriculture's alleged failure to enforce those regulations to challenge the 7% bidding preference given by Alaska to Alaska milk harvesters who sell milk to Alaska school districts. Alaska's in-state bidder preference statute is valid under the market participant exception to the dormant commerce clause.

AFFIRMED.