A.L. BLADES & SONS, INC.,
et al., Plaintiffs,

v.

Howard YERUSALIM, et al., Defendants.

No. 4:CV–94–2033.

United States District Court,
M.D. Pennsylvania.

Jan. 10, 1996.

James W. Kutz, David E. Lehman, Diane M. Tokarsky, McNees, Wallace & Nurick, Harrisburg, PA, for plaintiffs.

Susan J. Forney, Senior Deputy Attorney General, Office of Attorney General, Harrisburg, PA, for defendants.

### MEMORANDUM

McCLURE, District Judge.

### BACKGROUND:

This case requires the court to determine whether a statute that requires contractors to hire Pennsylvania residents to work on state-funded public works violates the Privileges and Immunities Clause of the Constitution of the United States. Plaintiffs, a highway construction contractor and two of its employees, initiated this action with the filing of a complaint on December 16, 1994. The complaint alleges that the plaintiff contractor was awarded a contract for road construction within the Commonwealth of Pennsylvania, but later was informed that payment on the contract might be withheld because the two employees were residents of the State of New York. On January 20, 1995, the court issued a preliminary injunction against the enforcement of the allegedly offending statute.

The complaint sets forth four counts: under the Privileges and Immunities Clause, U.S. Const., art. IV, § 2, cl. 1 (Count I); under the Equal Protection Clause, U.S. Const., amend. IV (Count II); pursuant to 42 U.S.C. § 1983, with no specific provision of the Constitution or federal law otherwise set forth (Count III); and under the Constitution of the Commonwealth of Pennsylvania, specifically Pa. Const. art. I, § 1, and art. III, § 32 (Count IV).

Before the court is a motion by defendants for partial summary judgment, and a motion by plaintiffs for partial summary judgment and a permanent injunction. The motions relate to Count I of the complaint, the Privileges and Immunities Clause claim, upon which plaintiffs in large part appear to rely for the merits of their case.

### DISCUSSION:

#### I. STANDARD OF REVIEW

Summary judgment is appropriate if the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that *there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.*" Fed.R.Civ.P. 56(c) (emphasis added).

... [T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial. The moving party is 'entitled to judgment as a matter of law' because the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof.

*Celotex v. Catrett,* 477 U.S. 317, 323–324, 106 S.Ct. 2548, 2552–2553, 91 L.Ed.2d 265 (1986).

The moving party bears the initial responsibility of stating the basis for its motions and identifying those portions of the record which demonstrate the absence of a genuine issue of material fact. He or she can discharge that burden by "showing ... that there is an absence of evidence to support the nonmoving party's case." *Celotex,*

477 U.S. at 323, 325, 106 S.Ct. at 2552–2553, 2553–2554.

Issues of fact are genuine "only if a reasonable jury, considering the evidence presented, could find for the non-moving party." *Childers v. Joseph,* 842 F.2d 689, 694 (3d Cir.1988) (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 2510–2511, 91 L.Ed.2d 202 (1986)). Material facts are those which will affect the outcome of the trial under governing law. *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510. In determining whether an issue of material fact exists, the court must consider all evidence in the light most favorable to the non-moving party. *White v. Westinghouse Electric Co.,* 862 F.2d 56, 59 (3d Cir.1988).

## II. STATEMENT OF FACTS

The parties have stipulated to the following facts:

1. Plaintiff A.L. Blades & Sons, Inc. ("Blades"), is a heavy and highway contracting business, with a principal place of business at 7610 County Route 65, P.O. Box 590, Hornell, New York 14843. Blades is licensed to do business in, among other states, the Commonwealth of Pennsylvania.

2. Plaintiff Jeffrey Elliot is an adult individual who performs work as a Class I Laborer for Blades as work is available, and is a citizen and resident of the State of New York, with an address of 3965 Railroad Avenue, Scio, New York 14880.

3. Plaintiff Simon R. Barnes is an adult individual who performs work as a Class III Laborer for Blades as work is available, and is a citizen and resident of the State of New York, with an address of 1070 North Main Street, Limestone, New York 14753.

4. Defendants, who are sued in their individual and official capacities, are officials of the Pennsylvania Department of Transportation ("PennDOT"), including the Secretary of Transportation, the Deputy Secretary for Highway Administration, the District Engineer for Engineering District 2–0, the Assistant District Engineer for Construction in District 2–0, and an Assistant Construction Engineer in District 2–0.

5. PennDOT publishes standard specifications which are included in all of its contracts for highway construction, commonly known as the "Form 408 Specifications."

6. Section 107.26 of Form 408 reads:

**107.26 SELECTION OF LABORERS AND MECHANICS**—This section does not apply to projects which are partially or totally financed with Federal funds.

(a) **Residence Requirements.** Laborers and mechanics to be employed for work under the contract are required, by Act 1935–414, to have been residents of the State for a period of at least 90 days prior to their starting work on the contract. Failure to comply with these provisions will be sufficient reason to refuse paying the contract price.

(b) **Veteran's Preference.** In employment on public works, provisions of 51 P.S. 492.1 require a preferential rating, similar to that given to State employees, to any soldier making application for employment and on intended discharge for reduction in force. The word "soldier," as used in the cited act, means a person who served in the armed forces of the United States or in any official women's organization, during any war or armed conflict in which the United States was engaged, and who has an honorable discharge from such service.

Stipulation, Joint Exhibit 1.

7. On May 12, 1994, bids were opened for a project to be constructed in Potter County, Pennsylvania. The project was funded entirely by the Commonwealth.

8. Blades was the apparent low bidder for the project, and the contract was awarded to Blades on September 14, 1994.

9. The project was to be performed in Potter County, Pennsylvania, which is located geographically within Engineering District 2–0, and is in this judicial district.

10. Prior to the execution of the contract, at a preconstruction meeting held in September, 1994, Benjamin LaParne, the Assistant Construction Engineer assigned to the project, specifically discussed the residency requirements of Section 107.26 of Form 408.

11. The contract between PennDOT and Blades was executed in October of 1994, and a notice to proceed with work then was issued by PennDOT to Blades.

12. Upon receipt of the notice to proceed, Blades proceeded to perform work on the project. Included among the individuals Blades employed to work on the project were plaintiffs Jeffrey Elliot and Simon Barnes, both of whom are New York residents.

13. On November 23, 1994, Blades received a letter signed by Frank Latosky which informed Blades that both Section 107.26 of the Form 408 Specifications and Act 1935–414 prohibited the use of non-resident laborers and mechanics on 100% state-funded projects. The letter further informed Blades that "Timothy Elliott" was not a resident of Pennsylvania, and that until such time as Blades was in compliance with Act 1935–414, no payments would be made for work performed. The letter further indicated that continued non-compliance may result in Blades being declared in default of the contract, and may adversely affect Blades' pre-qualification status to do work in Pennsylvania.

14. Subsequently, on December 12, 1994, Blades received a letter from Mr. Latosky which clarified his November 23, 1994, letter. In the December 12 letter, Mr. Latosky noted that while Timothy Elliott (who had been identified in the November 23 letter) was a Pennsylvania resident, that Jeffrey Elliott [sic.] and Simon Barnes were not. Latosky then reiterated the threats to enforce the residency requirement against plaintiffs.

15. As reflected in the December 12 letter, defendants withheld payments totalling $18,171.00 from Blades for work performed on the project.

16. Accordingly, Commonwealth officials charged with the duty of enforcing the statute have both threatened to enforce the statute, and have actually enforced the statute as against both Blades and the individual plaintiffs.

17. The average annual unemployment rate for the construction industry in Pennsylvania has ranged from 10% to 20.7% during the ten-year period from 1983 through 1993. In 1993, the last year for which an average annual rate is available, the rate was 18%.

Other facts established by the record will be discussed below as relevant to the Discussion.

## III. PROVISIONS AT ISSUE

■ The statutory provision which Section 107.26 of Form 408 was designed to implement reads as follows:

**Resident laborers and mechanics**

The specifications upon which contracts are entered into by the Commonwealth, county, municipality, or other subdivisions of the Commonwealth, for the construction, alteration, or repair of any public works shall contain the provision that laborers and mechanics employed on such public works shall have been residents of the Commonwealth for at least ninety days prior to their employment; and failure to keep and comply with such provision shall be sufficient legal reason to refuse payment of the contract price to the contractor.

Act of July 19, 1935, Pub.L. 1321, No. 414, § 1 (1935), codified at 43 Pa.Stat.Ann. § 154. This Depression Era statute was designed to address the problem of unemployment in the construction industry and the resulting swell of unemployed construction workers on the "relief rolls." *See Legislative Journal,* House, May 1, 1935, at 3032 (remarks of Mr. Sowers; Documents in Support of Defendants' Motion for Summary Judgment at 585). According to defendants, the reasons for the statute continue to exist. Brief in Support of Defendants' Motion for Summary Judgment at 11.

■ Plaintiffs contend that § 154 violates, *inter alia,* the Privileges and Immunities Clause, which provides, "The Citizens of each State shall be entitled to all Privileges and Immunities of Citizens in the several States." U.S. Const. art. IV, § 2. The purpose of this Clause is to help foster national unity, balanced against the notion of sovereignty of the individual states:

The primary purpose of this clause, like the clauses between which it is located— those relating to full faith and credit and to

interstate extradition of fugitives from justice—was to help fuse into one Nation a collection of independent, sovereign States. It was designed to insure to a citizen of State A who ventures into State B the same privileges which the citizens of State B enjoy. For protection of such equality the citizen of State A was not to be restricted to the uncertain remedies afforded by diplomatic processes and official retaliation. "Indeed, without some provision of the kind removing from the citizens of each State the disabilities of alienage in the other States, and giving them equality of privilege with citizens of those States, the Republic would have constituted little more than a league of States; it would not have constituted the Union which now exists." . . .

*Toomer v. Witsell*, 334 U.S. 385, 395–396, 68 S.Ct. 1156, 1161, 92 L.Ed. 1460 (footnotes omitted; quoting *Paul v. Virginia*, 75 U.S. (8 Wall.) 168, 180, 19 L.Ed. 357 (1868)), *reh'g denied*, 335 U.S. 837, 69 S.Ct. 12, 93 L.Ed. 389 (1948).

## IV. DEFENDANTS' ARGUMENTS

The defendants argue that § 154 is justified under case law interpreting the Privileges and Immunities Clause. They point out that § 154 was enacted during the Great Depression, a time of heavy unemployment in the construction industry, and add:

> The problems Pennsylvania confronted in the Great Depression—unemployment and the exportation of benefits generated by government expenditures—continue today. Although these problems do not exist to the same extent they did in the 1930s, they continue to provide substantial reasons for [§ 154].

Defendants' Brief in Support of Motion for Partial Summary Judgment at 11. Although couched as one argument, defendants in essence offer two reasons for § 154 which may be considered separately: continuing unemployment in the construction industry and the loss of benefits resulting from the expenditure of Commonwealth funds.

### A. Standard Governing Privileges and Immunities Clause Claim

Review of a claim under the Privileges and Immunities Clause is a two-step process. First, the court must determine whether the right at issue is one of those which are fundamental to the promotion of interstate harmony. Second, the court must review the purpose of the state's action and determine whether there is a "substantial reason" for discrimination against out-of-state residents. *United Building and Construction Trades Council of Camden County and Vicinity v. Mayor of Camden*, 465 U.S. 208, 218, 222, 104 S.Ct. 1020, 1027–1028, 1029–1030, 79 L.Ed.2d 249 (1984) (hereinafter cited as *"United Building"*). Employment by a private contractor on out-of-state public works, even when the work is funded in whole by the foreign governmental entity, is a right fundamental to the promotion of interstate harmony, *United Building*, 465 U.S. at 221–222, 104 S.Ct. at 1029–1030, so that the first prong of the test is met. It should be noted as well that a requirement that a private employer contracting with the state hire residents of the state is fundamentally different from a residency requirement for persons hired by the state; public employees have no grounds for complaint under the Privileges and Immunities Clause. *Salem Blue Collar Workers Ass'n v. City of Salem*, 33 F.3d 265, 270 (3d Cir.1994) (relying on *United Building*), *cert. denied*, —— U.S. ——, 115 S.Ct. 1105, 130 L.Ed.2d 1071 (1995). The question, then, is whether the Commonwealth of Pennsylvania has a "substantial reason" to discriminate against out-of-state construction workers by not permitting them to work on projects funded wholly by the Commonwealth.

The issue of whether there are substantial reasons for the discrimination is broken down for further analysis:

> "[T]he inquiry in each case must be concerned with whether such reasons do exist and whether the degree of discrimination bears a close relation to them." . . . As part of any justification offered for the discriminatory law, nonresidents must somehow be shown to "constitute a pecu-

liar source of the evil at which the statute is aimed." ...

...

Every inquiry under the Privileges and Immunities Clause "must ... be conducted with due regard for the principle that the States should have considerable leeway in analyzing local evils and in prescribing appropriate cures." ... This caution in particularly appropriate when a government body is merely setting conditions on the expenditure of funds it controls....

*United Building,* 465 U.S. at 222–223, 104 S.Ct. at 1029–1030 (quoting *Toomer,* 334 U.S. at 396, 398, 68 S.Ct. at 1162, 1163).

### B. High Unemployment

■ The Commonwealth posits the high rate of unemployment in the construction industry as the "substantial reason" for its discrimination against out-of-state construction workers. We first examine whether non-residents constitute a peculiar source of this evil. In support of its contention, the Commonwealth points to a net exportation of construction industry wages from Pennsylvania, and to the fact that non-residents displace Pennsylvania residents from approximately 5% of the in-state jobs available in construction. Brief in Support of Defendants' Motion for Partial Summary Judgment at 12–13.

The problem with the Commonwealth's argument in this regard is that, as justification for its action, it relies upon the exact type of state action which the Privileges and Immunities Clause was designed to eliminate. The Commonwealth points to no basis independent of the status of certain workers as nonresident for the discrimination. That is, there is nothing in this sense different about non-resident construction workers which justifies the discrimination. Put another way, the Commonwealth's argument amounts to: "Our workers are unemployed. Workers from other states are working here. We prefer that non-resident workers were unemployed." Simply stated, this is not justification for discrimination; it is exactly the type of discrimination the Privileges and Immunities Clause is intended to prevent.

In this sense, then, this case is similar to *Toomer,* in which the Supreme Court struck down statutes governing shrimp fishing in South Carolina which discriminated against out-of-state shrimpers. With respect to South Carolina's proffered justification of conservation of shrimp resources, the Court stated:

In this connection appellees mention, without further elucidation, the fishing methods used by non-residents, the size of their boats, and the allegedly greater cost of enforcing the laws against them. One statement in the appellees' brief might also be construed to mean that the State's conservation program for shrimp requires expenditure of funds beyond those collected in license fees—funds to which residents and not non-residents contribute. Nothing in the record indicates that non-residents use larger boats or different fishing methods than residents, that the cost of enforcing the laws against them is appreciably greater, or that any substantial amount of the State's general welfare funds is devoted to shrimp conservation. But assuming such were the facts, they would not necessarily support a remedy so drastic as to be a near equivalent exclusion. ... We would be closing our eyes to reality, we believe, if we concluded that there was a reasonable relationship between the danger represented by non-citizens, as a class, and the severe discrimination practiced upon them.

*Toomer,* 334 U.S. at 398–399, 68 S.Ct. at 1163–1164.

In this case, there is nothing different about non-residents, as a class, which justifies the discrimination. No point with respect to union status or wages is raised, nor any practice or equipment employed by out-of-state construction workers which distinguishes them from Pennsylvania residents. No statute barring Pennsylvania residents from getting construction work in other states is set forth. No other manner in which out-of-state construction workers have an unfair advantage in the competition for jobs is described. It cannot be said, then, that non-residents are a "peculiar source of the evil" which § 154 is designed to remedy.

In fact, it does not appear from the record that unemployment in the construction industry is particularly a "local evil" which the statute is addressing. In the states around Pennsylvania, from which non-resident workers ordinarily would be drawn, the rates of unemployment in the construction industry are not greatly out of line with those in Pennsylvania. For example, in 1993 (the most recent year for which figures are available), those rates were:

| | |
|---|---|
| Pennsylvania | 18.0 |
| New York | 18.1 |
| New Jersey | 18.3 |
| Delaware | 11.7 |
| Maryland | 9.8 |
| West Virginia | 18.7 |
| Ohio | 13.6 |

Documents Submitted in Support of Defendants' Motion for Partial Summary Judgment at 44–45. Over the last ten years for which figures are available, 1983–1993 but excluding 1985, the average figures are:

| | |
|---|---|
| Pennsylvania | 16.04 |
| New York | 14.30 |
| New Jersey | 11.04 |
| Delaware | 10.43 |
| Maryland | 9.54 |
| West Virginia | 25.03 |
| Ohio | 16.91 |

Documents Submitted in Support of Defendants' Motion for Partial Summary Judgment at 44–74 (computed from figures provided). These figures show that, while Pennsylvania's average rate of unemployment is on the high end, it is hardly the highest, and all of the figures are above general levels of unemployment. Unemployment among Pennsylvania construction workers, then, cannot be said to be unique, and is not a "local problem" justifying "protectionist" measures relative to other states, particularly when viewed against those states most affected by the statute in question.

We hold that high unemployment among construction workers in Pennsylvania is not sufficient justification for discriminating against out-of-state workers in the manner required by the application of § 154.

### C. Migration of Public Expenditures

The Commonwealth also contends that the hiring of out-of-state workers by contractors for public works means that public expenditures are supporting businesses, etc., outside of Pennsylvania. Each construction job in Pennsylvania which is filled by a non-resident results in an income loss to Pennsylvania of $63,160.00, on average. Documents in Support of Defendants' Motion for Partial Summary Judgment at 27. This results in losses of state income tax, local income and other taxes, and disposable income is not spent in Pennsylvania businesses. *Id.*

In this respect, the Commonwealth raises a contention more akin to that in *United Building*. At issue in that case was a Camden city ordinance which set forth affirmative action "goals," a preference for hiring of Camden residents, and a requirement that a city contractor have a labor force for public works which included at least 40% Camden residents. Contractors also were required to ensure that subcontractors adhered to the latter requirement. 465 U.S. at 211–212, 104 S.Ct. at 1023–1024. The justification for the ordinance offered by Camden was that it was "necessary to counteract grave economic and social ills," such as unemployment, population decline, loss of businesses, and "middle class flight." The non-residents employed on public works in Camden were said to " 'live off' Camden without 'living in' Camden." 465 U.S. at 222, 104 S.Ct. at 1030.

The Court contrasted that justification with the justification offered by the state in *Hicklin v. Orbeck*, 437 U.S. 518, 98 S.Ct. 2482, 57 L.Ed.2d 397 (1978), in which the "Alaska Hire" statute was invalidated because of its sweeping reach into the private sector, encompassing contractors and subcontractors dealing with Alaska's oil and gas as well as suppliers of those businesses. The distinction, said the Court, was that the "ripple effect" described in *Hicklin* was not present in the Camden ordinance, and the ordinance was limited in scope to those persons working directly on public works projects. 465 U.S. at 223, 104 S.Ct. at 1030.

The Court in *United Building* remanded to the Supreme Court of New Jersey for

factual determination with respect to Camden's proffered justification. *Id.* Implicit in so doing is a holding that the proffered justification would, if supported by factual findings, support the discrimination embodied in the Camden ordinance.

 Plaintiffs have not filed any document directly responsive to defendants' statement of material, undisputed facts (appended to defendants' motion for summary judgment), nor have they presented any reason to discount or disregard the facts recited by defendants. Defendants' stated facts are accepted as true for purposes of the motion for summary judgment. *See* Fed.R.Civ.P. 56(e); Local Rule for the Middle District of Pennsylvania 7.4. As material specifically to the proffer of the outflow of money paid by the Commonwealth to out-of-state construction workers as a substantial reason for the enforcement of § 154, defendants state the facts recited below.

### D. Facts Supporting Defendants' Argument

1. Measured by contract price, approximately 15% of PennDOT highway construction projects are completely state funded while 85% are financed totally or partially with federal funds.

2. Non-resident construction workers take construction jobs in Pennsylvania that otherwise would be available to resident construction workers who are qualified and available to do the work.

3. The parties' experts estimate that 5% of the construction jobs available in Pennsylvania are performed by non-resident workers.

4. From May, 1994, through November, 1994, 5,000 members of the Laborers International Union of North America, AFL–CIO, who were Pennsylvania residents were qualified and available for employment on highway construction projects throughout Pennsylvania.

5. Non-residents who work in Pennsylvania remove much of their earnings to their places of residence.

6. For the most part, income "exported" from construction work is lost to the Pennsylvania economy; that is, it is not available in Pennsylvania for spending, saving, or local taxation.

7. Workers who are Pennsylvania residents spend and save much of their disposable income in Pennsylvania.

8. Based on date from 1990 and using the Pennsylvania Economic Model, the Commonwealth's expert estimates that $513,773 of construction wages and salaries earned in Pennsylvania flowed out of the state.

9. The estimate of $513,733 is net any inflow of income from Pennsylvania residents working in construction outside the Commonwealth. Although not recited by defendants, their expert estimated that this figure doubled between 1990 and 1994. Passmore Declaration at 4 (Documents in Support of Defendants' Motion for Summary Judgment at 27).

10. Using data from 1990, the Commonwealth's expert estimates that each construction job in Pennsylvania yielded $63,160 in disposable personal income that remained in the state.

11. The spending of a highway construction worker who is a resident of Pennsylvania contributes to the Pennsylvania economy through ripple effects that are not possible for non-residents.

12. Using data from 1990, the Commonwealth's expert estimates that the spending of a single resident highway construction worker generated an additional $64,705 of Pennsylvania total industrial output; an additional $39,176 of Pennsylvania goods and services sold for personal consumption, investment and government purchases, and for export from the Commonwealth; an additional $20,539 of Pennsylvania personal income; an additional $34,529 of total Pennsylvania income; and an additional Pennsylvania job.

13. Using 1990 data, the Commonwealth's expert also estimates that the spending of a single resident construction worker generates an average of $71 in local income tax.

14. The displacement of a resident construction worker by a non-resident construction worker causes the Pennsylvania economy to forego these ripple effects of spending.

15. Plaintiffs' expert estimates that, in 1990, 139 Pennsylvania residents would have been displaced from completely state-funded highway projects if the residency requirement of § 154 were eliminated.

16. Defendants' expert estimates that, in 1990, 245 Pennsylvania residents would have been displaced from completely state-funded highway projects if the residency requirement of § 154 were eliminated.

17. Assuming 139 workers would have been displaced, defendants' expert estimates that the economic impact in Pennsylvania would have been that state residents would have foregone $8,779,240 in disposable income; $9,869 in local income tax revenues would have been lost; the value of total industrial output would have been reduced by $8,993,995; the value of goods and services produced and sold would have been reduced by $5,445,464; total income, wages, salaries and other forms of income would have been reduced by $4,799,531; and 139 jobs in other sectors of the economy would be lost.

18. Assuming that 245 workers would have been displaced, defendants' expert estimates that the economic impact on Pennsylvania would have been that state residents would have foregone $15,449,700 in disposable personal income; $17,395 in local tax revenues would have been lost; the value of total industrial output would be reduced by $15,852,725; the value of goods and services produced and sold would have been reduced by $9,598,120; total income, wages, salaries and all other forms of income would have been reduced by $8,459,605; and 245 jobs in other sectors of the economy would be lost.

### E. Effect of Section 154

The conclusion to be drawn from these figures makes this case analogous to *United Building*. A large amount of money leaves the Commonwealth of Pennsylvania due to out-of-state construction workers. By defendants' expert's estimate, the figure exceeds

one million dollars. This effect is felt despite the enforcement of the residency requirement of § 154. Without that requirement, the outflow would balloon dramatically.

In *United Building*, the Supreme Court analogized a state's interest in controlling property it claims to own to a city's interest in controlling money it expends on public works:

> Much the same analysis, we think, is appropriate to a city's efforts to bias private employment decisions in favor of its residents on construction projects funded with public moneys. The fact that Camden in expending its own funds or funds that it administers in accordance with the terms of a grant is certainly a factor—perhaps the crucial factor—to be considered in evaluating whether the statute's discrimination violates the Privileges and Immunities Clause. But it does not remove the Camden ordinance completely from the purview of the Clause.

*United Building* at 221, 104 S.Ct. at 1029. The Court further added:

> Every inquiry under the Privileges and Immunities Clause "must . . . be conducted with due regard for the principle that the States should have considerable leeway in analyzing local evils and in prescribing appropriate cures." [*Toomer* at 396, 68 S.Ct. at 1162]. This caution is particularly appropriate when a government body is merely setting conditions on the expenditure of funds it controls.

*United Building* at 222–223, 104 S.Ct. at 1030.

In this instance, it is the fact that the projects to which § 154 applies are entirely state funded which is the crucial factor. The analysis is as follows:

1. The Commonwealth of Pennsylvania experiences an outflow of funds related to the construction industry.

2. This outflow exists despite a residency requirement for road construction projects funded entirely by the Commonwealth.

3. Without the residency requirement, the outflow of funds would be much more extreme, and would have serious, adverse

effects on the state economy in a number of ways.

4. Out-of-state construction workers are a peculiar source of this evil because they take the money with them, causing the drain.

5. By removing the residency requirement, the Commonwealth would effectively be subsidizing the outflow, since it is state funds which would be expended in the balloon effect.

6. The effect on out-of-state workers is not more sweeping that necessary, since the requirement does not even eliminate the outflow, and jobs on 85% of Pennsylvania's road construction projects still are available to out-of-state residents.

## V. CONCLUSION

We conclude that Pennsylvania has a substantial reason for discrimination against out-of-state workers, and that § 154 does not violate the Privileges and Immunities Clause of the Constitution of the United States. Plaintiffs' motion for partial summary judgment will be denied, and defendants' motion for partial summary judgment will be granted.

An appropriate order shall issue.