**A.L. BLADES & SONS, INC.; Jeffrey Elliot; Simon R. Barnes, Appellants,**

**v.**

**Howard YERUSALIM, Individually And In His Capacity As Secretary Of The Commonwealth Of Pennsylvania Department Of Transportation; William Moyer, Individually And In His Capacity As Deputy Secretary For Highway Administration Of The Department Of Transportation; George Khoury, Individually And In His Capacity Of District Engineer, Engineering District 2–0, Department of Transportation; Frank J. Latosky, Individually And In His Capacity As Assistant District Engineer Construction, Engineering District 2–0, Department of Transportation; Benjamin Laparne, Individually And In His Capacity As Assistant Construction Engineer, Engineering District 2–0, Department of Transportation; Bradley L. Mallory, in his official capacity; Michael M. Ryan, in his official capacity.**

No. 96–7448.

United States Court of Appeals, Third Circuit.

Argued April 17, 1997.

Decided Aug. 1, 1997.

James W. Kutz (Argued), Diane M. Tokarsky, McNees, Wallace & Nurick, Harrisburg, PA, for Appellants.

Susan J. Forney (Argued), Office of Attorney General of Pennsylvania, Department of Justice, Harrisburg, PA, for Appellees.

Before: SCIRICA, COWEN and NYGAARD, Circuit Judges.

**OPINION OF THE COURT**

SCIRICA, Circuit Judge.

██ The issue on appeal is whether Pennsylvania Act 1935–414 § 154 violates the Privileges and Immunities Clause of the United States Constitution by requiring contractors to employ only Pennsylvania residents as laborers and mechanics on Commonwealth-funded public works projects. Because the statute's discrimination is not "substantially justified," we hold it is unconstitutional.

## I.

On May 12, 1994, the Pennsylvania Department of Transportation accepted bids for the Potter County highway improvement construction project. A.L. Blades & Sons, a New York based highway construction contractor, was the apparent low bidder. After awarding the contract, PennDOT notified Blades that the § 154 residency requirement would be strictly enforced.

Section 154 of Pennsylvania Act 1935–414 provides:

> **§ 154. Resident laborers and mechanics**
>
> The specifications upon which contracts are entered into by the Commonwealth, county, municipality, or other subdivisions of the Commonwealth, for the construction, alteration, or repair of any public works shall contain the provision that laborers and mechanics employed on such public works shall have been residents of the Commonwealth for at least ninety days prior to their employment; and failure to keep and comply with such provision shall be sufficient legal reason to refuse payment of the contract price to the contractor.

Act of July 19, 1935, Pub.L. 1321, No. 414, § 1 (1935), *codified at* 43 Pa. Stat. Ann. § 154. This statute was enacted during the Great Depression to ensure that Pennsylvania residents, and particularly those unemployed, would be the sole beneficiaries of state funds spent on public works.[1]

To comply with the Act, PennDOT includes in each construction contract a provision which reads:

---

1. *See Legislative Journal*, House, May 1, 1935, at 3032 (remarks of Mr. Sowers)("[I]s it not our great problem to put those who are on the relief rolls to work?"); *Id.* at 3035 (remarks of Mr. McDevitt) ("Let us spend our money on our people. That is the only point involved here; to take care of Pennsylvania's unemployed with government money.").

**Section 107.26.** This section does not apply to projects which are partially or totally financed with Federal Funds.[2]

 a. **Residence requirements.** Laborers an d mechanics to be employed for work under the contract are required by Act 1935–414 to have been residents of the State for at least 90 days prior to their starting work on the contract. Failure to comply with these provisions will be sufficient reason to refuse paying the contract price.

The Potter County contract was fully financed by the Commonwealth and contained this residence provision. Nevertheless, Blades employed Jeffrey Elliot and Simon Barnes who were New York residents. In November and December 1994, PennDOT notified Blades that continued employment of nonresident workers could result in withholding contract payments and could affect its prequalification status to do future work in Pennsylvania. Following this notification, Blades fired Elliot and Barnes.

In December 1994, Blades, Elliot, and Barnes (hereinafter "Blades") brought this action against the Pennsylvania Secretary of Transportation and other officials of PennDOT.[3] The complaint alleged that Pennsylvania Act 1935–414 was invalid because it violated (1) the Privileges and Immunities Clause of the United States Constitution, (2) the Equal Protection Clause of the United States Constitution, (3) 42 U.S.C. § 1983, and (4) the Pennsylvania State Constitution. In

January 1995, the district court granted Blades preliminary injunctive relief prohibiting enforcement of the residency requirement on the Potter County project during the pendency of the action. Thereafter Blades completed the project.

■ Both Blades and the Commonwealth filed motions for partial summary judgment on the Privileges and Immunities claim.[4] The Privileges and Immunities Clause is violated when the "challenged restriction deprives nonresidents of a privilege or immunity protected by the Clause," "there is [no] substantial reason for the difference in treatment, . . . [and] the discrimination practiced against nonresidents [does not bear] a substantial relationship to the State's objective." *Barnard v. Thorstenn,* 489 U.S. 546, 552, 109 S.Ct. 1294, 1299, 103 L.Ed.2d 559 (1989); *see also Tolchin v. New Jersey,* 111 F.3d 1099, 1111 (3d Cir.1997). In view of this standard, the parties' evidence and arguments focused on whether the residency requirement was "substantially justified."

Blades' expert, Dr. Gerald Glyde, analyzed the construction industry for 1990, 1992, and 1994, and determined the impact of the Act on Pennsylvania unemployment was quite small. Without the residency requirement, he estimated that Commonwealth residents would have lost at least 57 construction jobs in 1994 and at most 139 jobs in 1990.[5]

Disputing this testimony, the Commonwealth asserted that unemployment in the

---

**2.** According to PennDOT approximately fifteen percent of PennDOT highway construction projects are completely Commonwealth-funded while eight-five percent are funded totally or partially with federal funds.

**3.** The defendants, the Pennsylvania Secretary of Transportation, the deputy Secretary for Highway Administration, the District Engineer for Engineering District 2–0, the Assistant District Engineer for Construction in District 2–0, and an Assistant Construction Engineer in District 2–0 (hereinafter "Commonwealth") were all sued in their individual and official capacities. William Moyer and Howard Yerusalim left PennDOT after the complaint was filed. Their replacements, Michael Ryan and Bradley Mallory, were subsequently added to the suit in their official capacities.

**4.** The Privileges and Immunities challenge may be brought on behalf of the individual plaintiffs but not A.L. Blades & Sons since it is a corporation. *Western & S.L.I. Co. v. Board of Equalization,* 451 U.S. 648, 656, 101 S.Ct. 2070, 2077, 68 L.Ed.2d 514 (1981) ("[T]he Privileges and Immunities Clause is inapplicable to corporations.").

**5.** Glyde's figures were subject to some uncertainty because there were many factors which might affect the impact of the Act which were not quantified or included in his analysis. For example, nonresident workers who replace the resident workers on the state projects may have left federal projects to work on the state projects, thereby leaving their old positions vacant for resident workers to fill. Also, there may be retaliation from other states that implement similar residency requirements which discriminate against Pennsylvania construction workers who seek employment out-of-state.

construction industry was high, and that out-of-state workers filled five percent of the available construction jobs in Pennsylvania. According to a limited survey conducted by PennDOT between May and November 1994 on federally funded Commonwealth highway construction projects, nonresident workers comprised eight percent of the construction workforce. But as Glyde explained, this percentage of nonresident labor on partially funded federal projects could result from their exclusion from fully funded Commonwealth projects. Under this view, the number of nonresident workers might not rise if the residency requirement were lifted.

The Commonwealth's expert, Dr. David Passmore, conducted a different analysis. Focusing on nonresident workers who work in Pennsylvania but remove their income to their states of residence, Passmore believed this "migration of economic benefits" caused Pennsylvania to lose a significant amount of spending, savings, and local taxes. Passmore estimated that in 1990 nonresidents working on construction projects in the Commonwealth earned and removed from Pennsylvania $513,773 in wages and salaries. Employing a ripple effect theory, Passmore testified that a single resident highway construction worker generated an additional $64,705 in Pennsylvania industrial output; $39,176 in Pennsylvania goods and services sold for personal consumption; $20,539 in Pennsylvania personal income; $34,529 in total Pennsylvania income; $71 in local Pennsylvania taxes; and one Pennsylvania job. As a consequence, Pennsylvania loses these economic benefits when it permits nonresidents to work on Commonwealth-funded construction projects. Looking at Glyde's 139 job loss figure, Passmore estimated Pennsylvania would have foregone $8,993,995 in industrial output value; $5,445,464 in goods and services; $8,779,240 in disposable personal income; $4,799,531 in total income; $9,869 in local taxes; and 139 Pennsylvania jobs.[6]

After Blades withdrew its state constitutional claims, the Commonwealth filed anoth-er motion for partial summary judgment on the equal protection count. The district court granted the Commonwealth summary judgment on the Privileges and Immunities claim and the equal protection claim. *A.L. Blades & Sons, v. Yerusalim*, 921 F.Supp. 251 (M.D.Pa.1996). This appeal followed.

## II.

We have jurisdiction over the final order of the district court under 28 U.S.C. § 1291. Our review of the district court's grant of summary judgment is plenary. "When we review a grant of summary judgment, we apply the same test as the district court should have applied initially." *Sempier v. Johnson & Higgins*, 45 F.3d 724, 727 (3d Cir.), *cert. denied*, —— U.S. ——, 115 S.Ct. 2611, 132 L.Ed.2d 854 (1995). A court may grant summary judgment when "there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c).

## III.

### A.

The Privileges and Immunities Clause of Article IV, § 2 of the United States Constitution provides: "The citizens of each state shall be entitled to all privileges and immunities of citizens in several states." The Clause is designed to prevent the discriminatory treatment of citizens from other states. As the Supreme Court held " '[i]t was undoubtedly the object of the [Privileges and Immunities] Clause ... to place the citizens of each State upon the same footing with citizens of other States, so far as the advantages resulting from citizenship in those States are concerned.' " *Baldwin v. Fish and Game Commission of Montana*, 436 U.S. 371, 380, 98 S.Ct. 1852, 1858, 56 L.Ed.2d 354 (1978) (quoting *Paul v. Virginia*, 75 U.S. 168, 180, 8 Wall. 168, 180, 19 L.Ed. 357 (1868)). In particular, the framers of the Constitution were concerned with

**6.** Passmore estimated the Commonwealth would lose 245 construction jobs if the residency requirement were lifted. Using this estimate, Passmore calculated Pennsylvania would lose $15,-852,725 in industrial output value; $9,598,120 in goods and services produced; $15,449,700 in disposable personal income; $8,459,605 in total income; $17,395 in local tax revenues; and 245 Pennsylvania jobs.

avoiding "the tendencies toward economic Balkanization that had plagued relations among the Colonies and later among the States under the Articles of Confederation." *Hughes v. Oklahoma,* 441 U.S. 322, 325–26, 99 S.Ct. 1727, 1731, 60 L.Ed.2d 250 (1979); *see also Laborers Local Union No. 374 v. Felton Constr. Co.,* 98 Wash.2d 121, 654 P.2d 67, 68 (1982) (*en banc* ) ("The history of the [Privileges and Immunities] clause reflects a concern by the framers for keeping the newly independent states from adopting highly protectionist economic policies."). The Constitution protects nonresidents from economic discrimination so that the nation may function as a single economic union.[7] *Id.*

 But this protection is not absolute. The Supreme Court has set forth a three-prong test to determine when a discriminatory act violates the Privileges and Immunities Clause. *See Toomer v. Witsell,* 334 U.S. 385, 396, 68 S.Ct. 1156, 1162, 92 L.Ed. 1460 (1948); 8 *United Bldg. & Constr. Trades Council of Camden County and Vicinity v. Mayor and Council of the City of Camden,* 465 U.S. 208, 218, 104 S.Ct. 1020, 1027, 79

L.Ed.2d 249 (1984). The Privileges and Immunities Clause only precludes discrimination against nonresidents when the governmental action "burdens" one of the privileges and immunities protected under the clause, and the government does not have a "substantial reason" for the difference in treatment or the discrimination practiced against the nonresidents does not bear a "substantial relationship" to the government's objectives. *See id.; Supreme Court of New Hampshire v. Piper,* 470 U.S. 274, 284, 105 S.Ct. 1272, 1278, 84 L.Ed.2d 205 (1985).

## B.

 In the first instance, we must determine whether the Act "burdens one of those privileges and immunities protected by the clause." *United Bldg.,* 465 U.S. at 218, 104 S.Ct. at 1027. In other words, the test is whether the "right" at issue is fundamental to the promotion of interstate harmony and bears upon the vitality of the Nation as a single union. *See id.* Typically the right to employment is considered fundamental under

7. Blades did not bring a Commerce Clause challenge to the residency requirement. The Commerce Clause and the Privileges and Immunities clause are often raised in tandem because both "centrally define the relationship of the states to one another and delineate the treatment that one state must accord the citizens of another." Laurence H. Tribe, American Constitutional Law § 6–1, at 401 (2d ed.1988). Moreover, both clauses are "rooted in the common purpose of protecting United States citizens from parochial, self-interested state actions that curtail economic and political freedoms of nonresidents and inhibit the growth of a competitive national market and a unified people." Thomas H. Day, Note, *Hiring Preference Acts: Has the Supreme Court Rendered them Violations of the Privileges And Immunities Clause?,* 54 Fordham L.Rev. 271, 274 (1985). But "[t]he two clauses have different aims and standards for state conduct." *United Bldg. & Constr. Trades Council of Camden County and Vicinity v. Mayor and Council of the City of Camden,* 465 U.S. 208, 220, 104 S.Ct. 1020, 1028, 79 L.Ed.2d 249 (1983). The Commerce Clause indirectly restrains state regulatory powers to the extent such powers interfere with Congressional legislation or Congress's decision not to legislate matters affecting interstate commerce. *Id.* Only state regulation that affects interstate commerce triggers a Commerce Clause analysis. Day, *supra,* at 274. Therefore, when the state acts as a market participant its actions do not implicate the Commerce Clause because there is no conflict between state regulations and

federal regulatory authority. *United Bldg.,* 465 U.S. at 220, 104 S.Ct. at 1028–29. "The Privileges and Immunities Clause, on the other hand, imposes a direct restraint on state action in the interests of interstate harmony." *Id.* This clause is triggered by "discrimination against out-of-state residents on matters of fundamental concern." *Id.* It appears therefore that a Commerce Clause challenge would have been ill-advised because the Commonwealth implements § 154 in its role as a "market participant" and not a "market regulator," even though there is a potential Privileges and Immunities challenge. *See United Bldg.,* 465 U.S. at 221, 104 S.Ct. at 1029 ("In sum, Camden may, without fear of violating the Commerce Clause, pressure private employers engaged in public works projects funded in whole or in part by the city to hire city residents."); *White v. Massachusetts Council of Constr. Employers, Inc.,* 460 U.S. 204, 210, 103 S.Ct. 1042, 1046, 75 L.Ed.2d 1 (1983) ("If the city is a market participant, then the Commerce Clause establishes no barrier to conditions such as[residency requirements] which the city demands for its participation. Impact on out-of-state residents figures in the equation only after it is decided that the city is regulating the market rather than participating in it, for only in the former case need it be determined whether any burden on interstate commerce is permitted by the Commerce Clause.").

the Privileges and Immunities Clause. *Id.* at 221, 104 S.Ct. at 1029 ("Certainly, the pursuit of a common calling is one of the most fundamental of those privileges protected by the Clause."). But "direct public employment," where the state imposes a restriction on its own hiring practice, is not an actionable right. *Salem Blue Collar Workers Ass'n v. City of Salem,* 33 F.3d 265, 270 (3d Cir.1994) ("[W]e hold that direct public employment is not a privilege or fundamental right protected by the Privileges and Immunities Clause of Article Four"), *cert. denied,* 513 U.S. 1152, 115 S.Ct. 1105, 130 L.Ed.2d 1071 (1995). Nonetheless there is a fundamental right to employment where the employee is hired by a private employer who receives a government contract to work on a public project. *United Bldg.,* 465 U.S. at 221, 104 S.Ct. at 1029 ("In sum, Camden may, without fear of violating the Commerce Clause, pressure private employers engaged in public works projects funded in whole or in part by the city to hire city residents. But that same exercise of power to bias the employment decisions of private contractors and subcontractors against out-of-state residents may be called to account under the Privileges and Immunities Clause"). Blades has satisfied the first prong of the *Toomer* test.

## C.

The second prong of the test is whether there is a *substantial reason* for the statute's discriminatory approach beyond the mere fact that the targeted group is comprised of citizens of other states.[8] *Toomer v. Witsell,* 334 U.S. 385, 396, 68 S.Ct. 1156, 1162, 92 L.Ed. 1460 (1948) (the Clause "bars discrimination against citizens of other States where there is no substantial reason for the discrimination beyond the mere fact that they are citizens of other States."); *United Bldg.,* 465 U.S. at 222, 104 S.Ct. at 1029. To prove "substantial justification" the Com-

monwealth has the burden of proving there is a valid independent reason for the disparate treatment and that nonresidents are a "peculiar source of the evil at which the statute is aimed." *Toomer v. Witsell,* 334 U.S. at 399, 68 S.Ct. at 1163; *Hicklin v. Orbeck,* 437 U.S. 518, 525–26, 98 S.Ct. 2482, 2487–88, 57 L.Ed.2d 397 (1978).[9] But when the statute imposes restrictions on the state's expenditure of its own funds, courts must grant deference to the state's funding determinations. *United Bldg.,* 465 U.S. at 222–223, 104 S.Ct. at 1029–30 (quoting *Toomer,* 334 U.S. at 396, 68 S.Ct. at 1162) ("Every inquiry under the Privileges and Immunities Clause 'must ... be conducted with due regard for the principle that the States have considerable leeway in analyzing local evils and in prescribing appropriate cures.' ... This caution is particularly appropriate when a government body is merely setting conditions on the expenditure of funds it controls.").

The Commonwealth offered two "substantial justifications" for the § 154 residency requirement— alleviating high unemployment in the Commonwealth's construction industry and avoiding the loss of economic benefits resulting from the expenditure of Commonwealth funds on nonresident workers. The district court rejected the unemployment justification, but held the loss of economic benefits attributed to nonresident workers removing their earnings to their states of residency justified the statute's discriminatory approach. *Blades,* 921 F.Supp. 251. Because we find the Commonwealth's reasons insufficient to "substantially justify" § 154's discriminatory approach, we will not reach the third *Toomer* prong that requires the State to demonstrate "the discrimination practiced against nonresidents bears a substantial relationship to the State's objective." *Supreme Court of New Hampshire v. Piper,* 470 U.S. 274, 284, 105 S.Ct. 1272, 1278, 84

---

8. Even though Blades bears the burden of proving the Commonwealth's residency requirement is unconstitutional, once it is shown the statute discriminates against nonresidents' fundamental rights, the Commonwealth bears the burden of substantially justifying the discrimination. *W.C.M. Window Co., Inc. v. Bernardi,* 730 F.2d 486, 498 (7th Cir.1984); *see Hicklin,* 437 U.S. at 526, 98 S.Ct. at 2488.

9. "Peculiar" is defined as "belonging exclusively or esp[ecially] to a person or group ... tending to be characteristic of one only; Distinctive." Webster's Third New International Dictionary 1663 (Philip Babcock Gove ed., 1964).

L.Ed.2d 205 (1985). We will address each "significant justification" in turn.

#### i.

The first inquiry is straightforward. The district court held that the unemployment theory failed the "peculiar source" prong of the substantial justification analysis. We agree.

The Commonwealth proffered no evidence why the nonresident employees constituted a "peculiar source" of the Commonwealth's high unemployment in the construction industry. First of all, on a comparative basis, the unemployment rate for Pennsylvania's construction industry is not high. The district court found that in comparison to neighboring states, Pennsylvania's construction industry unemployment rate was not significantly higher. *Blades*, 921 F.Supp. at 258 (In 1993, the most recent year for which unemployment figures are available, Pennsylvania's construction industry unemployment rate was 18%, while New York's was 18.1%, New Jersey's was 18.3%, West Virginia's was 18.7%, Ohio's was 13.6%, and Delaware's was 11.7%). As the district court noted the rate of "unemployment among Pennsylvania construction workers ... [is not] unique, and is not a 'local problem' justifying 'protectionist' measures relative to other states, particularly when viewed against those states most affected by the statute in question." *Id.*

Secondly, there is no record evidence of any difference between the nonresident construction workers and the resident construction workers, other than their states of residency. As the district court found: "No point with respect to union status or wages is raised, nor any practice or equipment employed by out-of-state construction workers which distinguishes them from Pennsylvania residents." *Blades*, 921 F.Supp. at 257. There is no distinguishing characteristic which allows Pennsylvania to discriminate against the nonresident workers.

The record also reflects that nonresident employees do not constitute a peculiar source, or for that matter a significant source, of unemployment in the construction industry. The Commonwealth's expert estimated "that in 1990, 245 Pennsylvania residents would have been displaced from fully state-funded highway projects if the residency requirement of Act 1935–414 were eliminated." Defs.' Statement of Material Undisputed Facts, at[10], ¶ 47.10 Assuming Passmore's job loss figure was correct, and Glyde's estimated Pennsylvania construction industry unemployment and construction labor force totals are accurate (36,900 and 263,700 for 1990), then the additional nonresident construction workers would have accounted for only .66% of the total number of unemployed Pennsylvania construction workers in 1990. Stated differently, the removal of the residency requirement in 1990 would have increased unemployment in the construction industry by only .093%. For 1990, nonresidents did not constitute a "peculiar source" of Pennsylvania's unemployment problem.[11]

The Commonwealth did not demonstrate that nonresidents were a "peculiar source," or for that matter a significant source of the unemployment evil the residency statute was intended to address.[12] Considering Pennsyl-

---

**10.** The 1990 figures were the most favorable statistics in the record for the Commonwealth. Therefore, we analyze this year to determine if the nonresidents constitute a "peculiar source" of the unemployment problem. If they do not qualify as a "peculiar source" in 1990, then the Commonwealth cannot argue the nonresidents satisfy the test for the other years where the job displacement figures were lower.

**11.** A similar analysis was performed in *1st Westco Corp. v. School Dist. of Phila.*, 811 F.Supp. 204 (E.D.Pa.), *rev'd on other grounds*, 6 F.3d 108 (3d Cir.1993), where the court struck down a Pennsylvania School Code residency requirement for school construction projects practically iden-

tical to the one found in § 154. The court found the Commonwealth's purpose of reducing unemployment in the Pennsylvania construction industry did not justify the discrimination perpetrated against the nonresident workers. By focusing on the minuscule effect the Act had on the Pennsylvania construction unemployment rate (.037%), the court held that nonresident construction workers were not a peculiar source of the unemployment plaguing Pennsylvania's construction workers. *Id.* at 208.

**12.** A survey of the jurisprudence reveals six state courts that held similar construction industry residency requirements were unconstitutional. *Bernardi v. Leary Constr. Co., Inc.*, 102 Ill.2d 295,

vania's unemployed construction worker population is approximately 42,433, the slight benefit generated from the residency requirement does not substantially justify the discrimination.[13]

## ii.

The district court granted summary judgment for the Commonwealth holding that the migration of economic benefits theory substantially justified the discrimination found in § 154. The court found:

(1) The Commonwealth experiences an outflow of funds related to the construction industry.

(2) This outflow exists despite a residency requirement for road construction projects funded entirely by the Commonwealth.

(3) Without the residency requirement, the outflow of funds would be much more severe, and would have serious, adverse effects on the state economy in a number of ways.

(4) Out-of-state construction workers are a peculiar source of this evil because they take the money home, thereby causing the drain.

(5) By removing the residency requirement, the Commonwealth would effectively be subsidizing the outflow, since it is state funds which would be expended in the ripple effect.

(6) the effect on out-of-state workers is not more sweeping than necessary, since the requirement does not even come close to eliminating the outflow, and jobs on 85% of Pennsylvania's road construction projects are available to out-of-state residents.

*Blades,* 921 F.Supp. at 260–61.

## a.

■ Before a court determines whether nonresidents constitute a "peculiar evil," it first must find that the evil was one in which the "statute is aimed." *United Bldg.,* 465 U.S. at 221, 104 S.Ct. at 1029 (quoting *Toomer,* 334 U.S. at 398, 68 S.Ct. at 1163). Blades asserts the district court's holding was erroneous because the Pennsylvania General Assembly never considered the migration of economic benefits theory when drafting § 154. The district court acknowledged that the statute was "designed to address the problem of unemployment in the construction industry and the resulting swell of unem-

80 Ill.Dec. 36, 39, 464 N.E.2d 1019, 1022 (1984) ("There is nothing in the record, including the complaint itself, to show that nonresident laborers are a cause of unemployment in Illinois. Because no relationship has been established between nonresident employment on public works projects and resident unemployment, the nonresident laborers cannot be considered a 'peculiar source' of the evil unemployment."); *Laborers Local Union No. 374 v. Felton Constr. Co.,* 98 Wash.2d 121, 654 P.2d 67, 71 (1982) *(en banc)* ("The State seems to acknowledge its paucity of evidence in stating if the statute were struck down, nonresidents 'might otherwise drain the economy.' ... Neither appellants nor the State has shown 'something to indicate that non-citizens constitute a peculiar source of the evil at which the statute is aimed.' "); *Salla v. County of Monroe,* 48 N.Y.2d 514, 423 N.Y.S.2d 878, 399 N.E.2d 909, 914 (1979) ("In fact, there is nothing to indicate that an influx of nonresidents for any purpose is a major cause of our unemployment."), *cert. denied sub nom. Abrams v. Salla,* 446 U.S. 909, 100 S.Ct. 1836, 64 L.Ed.2d 262 (1980); *Neshaminy Constructors, Inc. v. Krause,* 181 N.J.Super. 376, 437 A.2d 733, 738 (N.J.Super.Ct. Ch. Div.1981) ("New Jersey, absent a special showing of specific dangers posed by out-of-state employees, may not attempt to solve its problems on the backs of citizens of our neigh-

boring states."), *modified on other grounds,* 187 N.J.Super. 174, 453 A.2d 1359 (N.J.Super.Ct.App.Div.1982); *Opinion of the Justices to the Senate,* 393 Mass. 1201, 469 N.E.2d 821, 824 (1984) (the Massachusetts Supreme Court found the residency requirement was unconstitutional); *Robison v. Francis,* 713 P.2d 259, 266 (Alaska 1986) ("There is no doubt that Alaska has an unemployment rate which is higher than the national average and that this constitutes a serious problem. What is lacking is a showing that non-residents are a 'peculiar source of the evil' of unemployment."). *But see State v. Antonich,* 694 P.2d 60, 63 (Wyo.1985) ("Accordingly, the Act directs its discriminatory treatment toward the nonresident applicants for jobs on public-works projects—those individuals who constitute the peculiar source of the evil identified by the State."). There is also one Federal Court of Appeals that considered the Privileges and Immunities Clause's application to a state construction industry residency requirement and found it unconstitutional. *W.C.M. Window Co., Inc. v. Bernardi,* 730 F.2d 486 (7th Cir.1984) (found Illinois statute unconstitutional).

13. The 42,433 figure was derived from averaging all of the estimated Pennsylvania Construction industry unemployment totals provided in the record (years 1990, 1992, 1994).

ployed construction workers on the relief rolls." *Blades,* 921 F.Supp. at 255. The legislative history reflects this. `See Legislative Journal,* House, May 1, 1935 at 3032 (remarks of Mr. Sowers) ("Let the other states look after their residents but we should look after our residents first. With a relief expenditure of $20,000,000 a month, it behooves us to save our taxpayers and give the work to our own people and remove as many people as possible from the relief roles."). Because there was no evidence that the migration of economic benefits was the particular evil § 154 was intended to address, Blades argues that the Commonwealth has not met its burden of showing a substantial justification for the discriminatory statute.

In response, the Commonwealth cites a single reference in a different passage of the legislative history which it believes establishes the legislature's intention to curb the migration of state funds. "In the lower end of our county we have ... many residents, many taxpayers, home owners, who are out of employment and there are people coming in from Delaware and Maryland who work all week, collect their pay on Saturday, and go back down into Delaware and Maryland and spend their pay, and have their families down there while our people in Delaware County are out of work." *Legislative Journal,* House, May 1, 1935 at 3034 (remarks of Mr. Turner).

As we have seen, the statute itself does not recite the purpose behind the residency requirement. But after reviewing the legislative debate, we believe unemployment and the related problem of a large number of Pennsylvanians on the "relief rolls" were the "evils" § 154 was intended to address when it was passed in 1935. Under the Supreme Court's test, the Commonwealth was re-

quired to establish that non-Pennsylvania residents "constitute a peculiar source of the evil at which the statute is aimed." *Hicklin,* 437 U.S. at 525–26, 98 S.Ct. at 2487–88. Although the substantial justification analysis has an intent requirement, it is not clear whether original intent is necessary, that is, the intent of the legislature in 1935. There is some question, therefore, whether the Commonwealth's current intention to prevent the migration of economic benefits through Act 1935–414 is sufficient to satisfy the requirement. But we need not resolve this issue because we find the migration of income theory fails the "peculiar source" component of the "substantial justification" test.

b.

If the migration of economic benefits is the evil § 154 was "aimed" to address, the Commonwealth must nonetheless establish that the nonresident construction workers, who are the targets of the discriminatory residency requirement, constitute a "peculiar source" of that migration.[14] This it has not done. The Commonwealth relies on its expert's opinion that nonresident construction workers removed their income from Pennsylvania, resulting in an economic loss to Pennsylvania's economy. While this evidence may be sufficient to demonstrate that nonresident workers are a source of the migration of economic benefits, it does not explain how they are a "peculiar" or distinctive source of that problem. The record is devoid of any evidence that nonresident construction workers remove a higher percentage of their wages or earn, in total, a larger amount of income than other nonresident Commonwealth workers who are employed outside of the construction industry. The record re-

14. Because the peculiar source component of the substantial justification test is dispositive, we do not reach the "valid independent" reason inquiry. But we note it is not clear the elimination of the migration of economic benefit problem constitutes a "valid independent" justification for the statute. In our complex national economy, discrimination against nonresidents because they choose to spend their incomes in their states of residence would appear to be the type of discrimination the Privileges and Immunities Clause was drafted to eliminate. *See Piper,* 470 U.S. at 279–80, 105 S.Ct. at 1275–76 ("[T]he Privileges and

Immunities Clause was intended to create a national economic union.") *Hicklin,* 437 U.S. at 526, 98 S.Ct. at 2488 (The Court observed that a State's attempt to reduce its unemployment problem through a residency requirement was "at least dubious."); *Felton Constr. Co.,* 654 P.2d at 70 ("It has only been suggested that by keeping within the state wages from public works projects, local economies will be strengthened. This is an example of the highly protectionist economic policies the privileges and immunities clause was designed to protect against.").

flects that at most a few hundred construction workers remove their earnings from the Commonwealth each year. There is no evidence that these workers' actions are distinct or unique from the legions of nonresident employees who remove their income from the Commonwealth daily. In fact, the Commonwealth has not established that these construction workers are damaging the Pennsylvania economy in any measurable, let alone significant way to justify an absolute ban on nonresident employment.[15] Without such a showing § 154 cannot be substantially justified. *Toomer,* 334 U.S. at 398, 68 S.Ct. at 1163.

In *Toomer* the Supreme Court refused to uphold South Carolina's commercial shrimp fishing statute which discriminated against nonresident shrimp fishermen, in part, because the record did not demonstrate how the nonresidents' fishing techniques harmed South Carolina more than the techniques of the South Carolina fishermen. South Carolina had passed a statute that required nonresident fishermen to pay commercial license fees one hundred times greater than the fees required from the resident fishermen. The Court held "[n]othing in the record indicates that non-residents use larger boats, or different fishing methods than residents, that the cost of enforcing the laws against them is appreciably greater, or that any substantial amount of the State's general funds is devoted to shrimp conservation." *Toomer,* 334 U.S. at 398, 68 S.Ct. at 1163. In other words, the record did not explain how nonresident fishermen were different, irrespective of their state of residency, from resident fisherman, and why a different state residen-

cy justified the discriminatory treatment. If it were found that nonresident fishermen engaged in different fishing practices from their resident counterparts that endangered the fish supply or South Carolina's economy, then the statute may have survived the Privileges and Immunities challenge. The record here suffers from a similar deficiency. If nonresident construction workers were shown to present a distinct significant harm to Pennsylvania then there might have been a basis to classify them as a "peculiar source" of the evil. Instead, the Commonwealth's evidence only established that nonresident construction workers conduct their financial affairs in the same manner as most nonresident workers and that the residency requirement's effect on the Pennsylvania economy is minimal at best.

If the Commonwealth's limited evidence were sufficient to substantially justify the discrimination, then the migration of economic benefits theory would validate virtually every employment residency requirement. But the Commonwealth's evidence is insufficient because the Privileges and Immunities Clause requires the nonresidents to be a peculiar source of the evil rather than merely a contributor to the problem.[16] Based on the record, the Commonwealth failed to satisfy its "substantial justification" burden.

c.

In granting summary judgment to the Commonwealth, the district court relied on *United Bldg. v. Mayor,* 465 U.S. 208, 222–23, 104 S.Ct. 1020, 1029–30, 79 L.Ed.2d 249 and

15. In fact, the Commonwealth's analysis only relied on a single job displacement estimate for the year 1990. There are no other estimates provided in the Commonwealth's evidentiary submission. But Blades' expert provided job displacement estimates for 1990, 1992, and 1994. He assumed at most 139 jobs would be lost to Commonwealth employees in 1990, 110 in 1992, and 57 in 1994. Therefore, according to Blades' estimates, the evil resulting from the use of nonresident construction labor has significantly diminished over the course of the 1990's.

16. The Alaskan Supreme Court found significant the failure to document, in the record, the savings generated from additional out-of-state contractors bidding on publicly funded projects. *See*

*Felton Constr. Co.,* 654 P.2d at 71 ("Finally, even if we were to assume some wages would be diverted out of state, we have been provided no information by which to compare how that 'loss' would compare with the advantage of lower bids on public works by out-of-state contractors.... We have not been told the magnitude of the economic gain to the state the statute provides by its employment restrictions or the loss it occasions by discouraging competitive bids."). Likewise here, the record does not disclose whether there might be economic benefits from lifting the nonresident employment ban. Given the limited scope of the record it is uncertain whether there is a net economic loss to the Pennsylvania economy.

in particular the Supreme Court's directive that states are entitled to more "leeway in analyzing local evils" when imposing limitations on the expenditure of their own funds. At issue in *United Bldg.* was the constitutionality of the Camden municipal ordinance which set minority hiring goals on all public works projects and created a hiring preference for local residents.[17] But even under this deferential standard, the Supreme Court remanded the case to the district court because of an insufficient record on substantial justification. In doing so, the Court stated: "[W]e find it impossible to evaluate Camden's justification on the record as it now stands.... It would not be appropriate for this Court either to make factual determinations as an initial matter or to take judicial notice of Camden's decay." *United Bldg.*, 465 U.S. at 223, 104 S.Ct. at 1030. The City of Camden had not yet demonstrated that the nonresident employees were the peculiar source of Camden's urban decay and high unemployment rate.

Here, the Commonwealth failed to present any evidence proving that nonresident construction workers were a peculiar source of the migration of economic benefit problem. Because neither the unemployment or economic benefit migration justifications satisfy the *Toomer* test, the Commonwealth has failed to establish that Act 1935–414 § 154 is constitutional.[18]

## IV.

For the foregoing reasons we will reverse the district court's grant of summary judgment for the Commonwealth. We will remand this matter to the district court with instruction to enter judgment for plaintiffs.

17. The ordinance required that contractors who receive city funded construction contracts "shall make every effort to employ persons residing within the City of Camden but, in no event, shall less than forty percent (40%) of the entire labor force be residents of the City of Camden." *United Bldg.*, 465 U.S. at 211, 104 S.Ct. at 1024 (quoting Ordinance MC 1653 § C(IV)(b), App. to Juris. Statement A56). Before the case was de-

cided by the Supreme Court the ordinance was amended to change the residency "quota" to a hiring "goal." *Id.* at 214, 104 S.Ct. at 1025.

18. Because we conclude Section 154 violates the Privileges and Immunities Clause of the United States Constitution, we do not reach the equal protection challenges.